**STATE of Missouri, Respondent,**

v.

**David A. PETERSON, Appellant.**

**No. KCD 27230.**

Missouri Court of Appeals, Kansas City District.

July 7, 1975.

R. Brian Hall, Gladstone, for appellant.

John C. Danforth, Atty. Gen., K. Preston Dean, II, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., PRITCHARD, C. J., and SWOFFORD, J.

SOMERVILLE, Presiding Judge.

Defendant was found guilty by a jury of illegal possession of more than thirty-five grams of marijuana (Sections 195.020 and 195.200, RSMo 1969, V.A.M.S., as amended, Laws of 1971) and his punishment was fixed at two years imprisonment in the Department of Corrections. The marijuana which defendant was charged and found guilty of illegally possessing was obtained by a warrantless search.

Defendant duly appealed, and in pressing this court for relief charges five instances

of alleged error. His first charge, that the trial court erred in overruling his motion to suppress the marijuana, and in admitting it into evidence over his objection, because the warrantless search by which it was obtained was proscribed by the Fourth Amendment to the Constitution of the United States, becomes the critical focal point of review since it is decisive of the appeal.

Evidence adduced at the hearing held on defendant's pre-trial motion to suppress showed that at about 1:25 a. m. on July 18, 1973, as part of "a raid" called by "a Clay County Investigative Squad" to "serve numerous warrants", Detective Captain Arthur L. Piburn of the Gladstone, Missouri, Police Department, proceeded to 8 North East 70th Place in Gladstone, Missouri. The address was the home of defendant's parents. The home faced the south. Piburn had with him a "Clay County warrant" for defendant's arrest "for dispensing marijuana". Piburn was accompanied by two other Gladstone police officers and a Missouri Highway Patrol trooper. Piburn and one of the police officers approached the home from the front and the other police officer and the trooper approached the home from the rear. Defendant and both of his parents were in the home asleep at the time. Piburn knocked at the front door of the home and defendant's father responded and opened the front door. Piburn asked if defendant was there and his father replied that he was. Piburn then advised defendant's father that they had a warrant for defendant's arrest "for dispensing marijuana", and the arrest warrant was displayed. Defendant's father advised that defendant was asleep in the basement at the time and he would go and get him. Piburn declined the offer and said he and the officer would go and get defendant. Piburn and the police officer with him were then admitted into the home and they proceeded to the basement. During the "commotion" defendant's mother awakened, and she and defendant's father followed the officers down into the basement. The base-

ment was divided into two sections "down the middle" running east and west. The west end of the north section was further "sectioned off" into a "room" by means of a "bamboo curtain" and a "British flag". The flag was hung so that it could be pushed aside to go "in and out" of the "room" formed by the "sectioned off" area. The "room", as described, was rented by defendant from his parents for $60.00 a month and was furnished with bedroom furniture belonging to defendant. Defendant's father testified that the "room" was "exclusively" the defendant's "area" and no one else "had a right to be there". This testimony by defendant's father is the sum and substance of all the evidence presented concerning right of access to and control of the basement "room" rented by defendant from his parents.

Piburn and the other officer with him entered the "room" where they observed defendant asleep in bed without any clothes on. Piburn awakened defendant and read the arrest warrant to him. While doing so, Piburn noticed "a brown leaf with a stem on it that appeared to be marijuana" tacked to the wall just above the bed which defendant had been asleep on.

There was a basement door near the "room" occupied by defendant which provided access to and from the rear yard of the home. The other police officer and the trooper who had gone to the rear of the house were subsequently admitted through the basement door. They entered the basement "room" occupied by defendant while he was in the process of getting dressed.

Either Piburn or one of the other officers searched each item of defendant's clothing before permitting him to dress. After defendant was dressed, he was handcuffed and the other two Gladstone police officers led him out of the house and placed him in a patrol car that was parked outside, leaving Piburn and the trooper in the "room" with defendant's father and mother. Defendant's mother and father were in the

"room" when defendant was arrested, while he dressed, and when he was handcuffed and taken from the house. Defendant's mother, according to Piburn, "was quite upset" at the time and "she was wanting to know what was going on, why we were there, what had he done and mostly crying, very upset", and defendant's father, who was also quite upset at the time, was "attempting to calm" her down.

After defendant was taken outside and placed in the patrol car, Piburn asked defendant's father, who at the time was "upset and confused", if it would be alright if they searched the "room" for "marijuana" and, according to Piburn, "he said 'Go ahead', something to that effect." Piburn and the trooper then proceeded to search the basement "room" from which defendant had been removed. During the course of the search the trooper found a "large brown sack" near the foot of the bed on a pile of "bed clothes" or "discarded clothing". A purse was also discovered in another part of the room, and it contained a substance which was later identified as marijuana. The brown paper sack was either folded or twisted, when found by the trooper, so that its contents were not visible or in plain view. Piburn opened the brown paper sack and, according to his testimony, "it contained I believe seven smaller sacks, some paper, some plastic, containing various amounts of brown ground up plant material." Piburn also testified that the contents of the brown paper sack were subsequently analyzed as marijuana. Two cigarette butts found during the search were also subsequently analyzed as marijuana, as was the brown leaf with the stem on it tacked above defendant's bed. The contents of the brown paper sack, the purse, and two cigarette butts and the brown leaf with the stem on it tacked above defendant's bed were seized by Piburn and removed from the home. However, defendant was charged and tried solely for possession of the contents of the brown paper sack.

During cross-examination of Piburn by defendant's counsel at the pre-trial hearing on defendant's motion to suppress, the following occurred:

"Q Was there any remonstrance by Mr. Peterson when his son was handcuffed?

MR. ALLEN [attorney for the state]: Your Honor, I object to that as irrelevant.

MR. HALL [attorney for defendant]: Your Honor, we're trying to show here the character of this whole thing in terms of illegal search and seizure and as to whether or not the defendant or his parents were making decisions freely of their own choice, and I think it's necessary to show the nature of it, to show whether or not there might be any duress involved. This is a part of the motion to suppress.

MR. ALLEN: May it please the Court, I'm submitting this not as a consentual search at any rate, but a search incidental to a lawful arrest where they had a warrant, and the marijuana was in a paper bag out in plain view at this point. I think this is all irrelevant.

THE COURT: I'm going to overrule the objection at this point, but if you would hurry through it because I tend to agree with Mr. Allen.

MR. HALL: All right."

Defendant's counsel did not press Piburn for an answer to the above question, and it went unanswered.

During direct examination of defendant's father, called as a witness by defendant at the pre-trial hearing, the following occurred:

"Q All right. After you were advised to stand back by whatever officer it was, what happened after that?

A Well, Marie, she was crying and I went over there trying to get her

settled down. I was pretty settled up myself.

MR. ALLEN: May it please the Court, I must interpose an objection here for the reason this is all irrelevant really.

MR. HALL: Your Honor,—

THE COURT: It's sustained. as to the last answer and question.

MR. HALL: Pardon me.

THE COURT: It's sustained as to the last question and answer."

During direct examination of defendant's mother, called as a witness by defendant at the pre-trial hearing, the following occurred:

"Q And what did you see when you arrived in the basement?

A They were awakening David.

Q All right. What was your condition at this time?

MR. ALLEN: Your Honor, her condition is irrelevant I believe, unless it goes to her ability to recall events.

MR. HALL: Your Honor, it's relevant in terms of whether or not there is any duress of the gentleman who allegedly gave consent.

MR. ALLEN: May it please the Court, I've already pointed out this is not a consentual search. This is a search incidental to a lawful arrest based upon a warrant, and his own evidence showed this was in the defendant's exclusive area, an area where they had a complete right to search and his own evidence has proved this because it was the defendant's area.

THE COURT: As I understand it then, the state is asking me to decide the issue here today not on the basis of consentual consent but on the basis that the search is to be incident to a lawful arrest?

MR. ALLEN: Yes, sir, based upon their evidence. The officers didn't know who had—

THE COURT: Very well.

MR. ALLEN: —authority to make consent at the time but his evidence has now established that this was the defendant's area.

THE COURT: Very well, then the objection is sustained.

MR. HALL: Under those circumstances, I have no further questions."

Evidence adduced at the hearing on defendant's motion to suppress has not been sparingly referred to because judicial determination of the constitutionality of warrantless searches necessarily turns on the "concrete factual context of the individual case." *Sibron v. State of New York,* 392 U.S. 40, 59, 88 S.Ct. 1889, 1901, 20 L.Ed.2d 917, 932 (1968).

Every judicial review of a warrantless search is permeated with the cardinal principle that all warrantless searches, subject only to a few well delineated exceptions, are per se constitutionally offensive. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967), and *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971). Defendant contends the warrantless search in question is beyond the perimeter of any and all exceptions to the cardinal principle just mentioned. The state rejoins by seeking to uphold the constitutionality of the warrantless search on the basis of one or all of three recognized exceptions. In the order argued by the state, they are: (1) The search was incident to defendant's lawful arrest; (2) Exigent circumstances existed which insulated the search from being condemned as constitutionally unreasonable; and (3) Consent given by defendant's father to the officers to conduct the search obviated any warrant requirement.

In deciding the principal question posed by this appeal this court, regardless of a perfectly human and natural inclination otherwise, must obliterate from considera-

tion the question of defendant's guilt or innocence of the charged offense, and restrict its review to the sole question of whether the marijuana was obtained by an "unreasonable" warrantless search, or, on the other hand, whether the warrantless search, when viewed in its "concrete factual context", falls within one of the recognized exceptions advanced by the state.

■ Numerous decisions handed down by the Supreme Court of the United States have articulated the often stated and broadly asserted proposition that a warrantless search incident to a lawful arrest, even in a person's place of abode, is a recognized exception to the Fourth Amendment's admonition against unreasonable searches. For instance see *Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) and *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Even so, a warrantless search claimed to be incident to a lawful arrest is not constitutionally permissible unless it meets certain temporal and spatial requirements. As expressed in *Stoner v. State of California,* 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856, 859 (1964), "a search can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), refined the spatial scope of permissible warrantless searches incident to lawful arrests by limiting them to the arrested subject's person and the area immediately accessible to him from which he might obtain a weapon or seize and destroy evidence which might be used against him. The underlying rationale of both *Stoner* and *Chimel,* insofar as relating to searches beyond the person of the arrestee, is obvious. When an arrest is completed and the subject is removed from the area to be searched, danger that the arrestee might procure a weapon from the area to be searched and endanger the arresting officers or destroy evidence located in the area

to be searched, the justifying essence of warrantless searches incident to lawful arrests, no longer exists. This court encounters no qualms, because of basic logic or established, applicable legal doctrines, in holding that the search conducted by the officers in defendant's "room" after he was handcuffed and removed to the patrol car parked outside his parents' home was not incident to his arrest. Any other holding would constitute a bizarre and totally unjustified application of the first exception invoked by the state to validate the warrantless search that was conducted.

■ Can the warrantless search pass constitutional muster as being reasonable because of the existence of "exigent" circumstances? Constitutional validation of warrantless searches (of places of abode as opposed to automobiles) due to the presence of "exigent" circumstances, perhaps more so than all other warrant requirement exceptions, is virtually incapable of being pragmatically expressed. Basically, as in all warrantless searches, it involves a delicate balancing of an individual's right to have his place of abode secure from intrusion against the interest of society at large in obtaining incriminating evidence with which to prosecute violators of the law. Although both are salutary goals and each serves a societal interest, the scales must inevitably tip one way or the other. The Supreme Court of the United States in at least three cases, *Johnson v. United States,* 333 U.S. 10, 14–15, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) and *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), has broadly suggested, without laying down any applicatory guidelines, that the threatened removal, destruction, or concealment of evidence or contraband, if accompanied by the existence of probable cause to believe that such evidence or contraband is present at a particular place and is so threatened, may constitute exigent circum-

stances rendering a warrantless search of a person's place of abode constitutionally permissible. The conceptual basis for justifying warrantless searches due to "exigent" circumstances undoubtedly lies in the inexorable fact that the Fourth Amendment does not positively mandate that all searches be conducted pursuant to a warrant issued by a neutral magistrate upon a showing of probable cause, but, instead, proscribes "unreasonable" searches. If such were not true, no warrantless search could be sustained under the Fourth Amendment. The circumstances spoken of in *Johnson, McDonald* and *Jeffers, supra,* and relevant attendant factors which raise them to a state of constitutional exigency, with but limited exceptions, have never been clearly articulated in either federal case law or the case law of this state.

One notable exception in the body of federal case law is *United States v. Rubin et al.,* 474 F.2d 262 (3rd Cir. 1973), cert. denied 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973). In *Rubin* federal customs agents had positive knowledge that approximately ninety pounds of "hashish" was located in a certain residence which they had under surveillance. A search warrant was in the process of being procured. Before the search warrant could be obtained one of the co-defendants left the residence in a motor vehicle and he was placed under separate surveillance. A compatriot of the co-defendant who left, whom the agents had reason to believe was also involved with the "hashish", remained in the residence. While following the co-defendant, it appeared to the agents that defendant had become aware of their presence. Therefore, the agents stopped and arrested the co-defendant at a gasoline filling station some six blocks from the residence where the "hashish" was located. "Kief", a form of "hashish", was found "all over" the co-defendant's clothes when he was arrested, and the court held such permitted the agents to conclude that distribution of the "hashish" was in progress. When the co-defendant was arrested he yelled to the gasoline service station attendants, "Call my brother". The agents testified at a pre-trial hearing that at that point "they reasonably believed that there existed 'the threat of destruction' to the 'hashish'". After the co-defendant was arrested, the agents proceeded to the residence and seized the "hashish" without benefit of a search warrant. The Court of Appeals, although it upheld the warrantless search, very carefully pointed out, l.c. 268, that *"[m]ere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant."* (Emphasis added.) See also: *Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925) and *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409, 413 (1970). In upholding the warrantless search, the Court of Appeals held and stated, l.c. 268–269: "When Government agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant, *compare United States v. Pino,* 431 F.2d 1043, 1045 (2d Cir. 1970), *with Niro v. United States,* 388 F.2d 535 (1st Cir. 1968); (2) reasonable belief that the contraband is about to be removed, *United States v. Davis,* 461 F.2d 1026, 1029–1030 (3d Cir. 1972); *Hailes v. United States,* 267 A.2d 363 (D.C.C.A.1970); (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought, *United States v. Pino,* 431 F.2d at 1045; (4) information indicating the possessors of the contraband are aware that the

police are on their trail, *United States v. Doyle*, 456 F.2d 1246 (5th Cir. 1972); and (5) the ready destructibility of the contraband and the knowledge 'that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic,' *United States v. Manning*, 448 F.2d 992, 998–999 (2d Cir. 1971); *United States v. Davis*, 461 F.2d at 1031–1032."

A notable exception in the body of case law in this state is *State v. Wiley*, 522 S.W.2d 281 (Mo. banc 1975). The court in *Wiley* upheld a warrantless search due to the existence of "exigent" circumstances. In *Wiley* the officers who conducted the warrantless search had probable cause to believe, via information supplied by an informant over the telephone, part of which was verified, that certain persons present in an apartment had drugs stored in a refrigerator located therein, and, after finishing a meal they were in the process of eating, were going to Illinois to dispose of the drugs. Two of the persons reported by the informant as being in the apartment were known by the officers as having the reputation of "trafficking" in drugs. The apartment building was staked out, and a second telephone call from the informant advised that a sale of drugs had been made. The officers who had the apartment building staked out observed a known user of drugs "in and about the apartment" and then saw him leave. Additionally, an orange Pinto with an Illinois license plate was observed pulling into the apartment parking lot. The orange Pinto "left in a very big hurry" when the occupants "spotted" one of the officers who had the apartment building under surveillance. After an unsuccessful attempt to obtain a search warrant, the officers entered the apartment and arrested the occupants "for possession of contraband substances", and one of the officers, immediately after the arrests, walked directly into the kitchen to the refrigerator and removed thereform a quantity of "morphine sulfate" and Fiorinal with codeine No. 1." The Supreme Court, in validating the war-

rantless search, emphasized (1) the existence of "exigent" circumstances, facts from which the officers could reasonably conclude that removal or destruction of the drugs was imminent or threatened, and (2) the limited nature of the search, i. e., its confinement to the refrigerator where the informant had advised drugs were located. The court also held, without specifically denominating such as an "exigent" circumstance, that the limited search involved could be sustained "upon another ground", namely, that it was "important in these early moments after the arrest that defendant and others either be detained or released" and, therefore, it was "reasonable" for the officers to search the refrigerator "to verify the accuracy" of the information supplied by the informant. The court in summation held: "We hold, therefore, under the restricted fact situation here, that when the informant provided information concerning the exact location of the substances, a search of that location was not unreasonable. We do not, however, determine that had the information of the location of the substances been more general, such as in the apartment, that a search of the entire apartment or even of the entire room would have been warranted without a search warrnat. We merely say that under the restricted circumstances here we do not find the action of the officers to have been unreasonable."

The facts and girding rationale of *United States v. Rubin, supra*, and *State v. Wiley, supra*, have been set forth at considerable length in order to determine whether there are any factual parallels between them and the instant case, as measured by the principles of law enunciated therein, to support the state's argument that Piburn and the trooper were confronted with "exigent" circumstances which relieved them from obtaining a search warrant.

That portion of the opinion in *Wiley* holding that the limited search could be justified as reasonable because it enabled the officers to determine whether the occupants

of the apartment should be released or retained in custody, immediately fades from serious consideration. Here the defendant was arrested and taken into custody by virtue of an arrest warrant for an alleged offense totally unconnected with the contraband that was seized during the warrantless search.

 Based on the facts presented by this appeal as measured by the facts and legal principles of *United States v. Rubin, supra,* and *State v. Wiley, supra,* can it be said that the circumstances facing Piburn and the trooper had reached a state of constitutional exigency, thereby precluding the necessity of a search warrant? Assuming, arguendo, that probable cause existed for the officers to believe that additional contraband might be cached in defendant's "room"—presence of what appeared to be marijuana tacked to the wall above defendant's bed coupled with knowledge that the warrant which they carried for defendant's arrest was for "dispensing marijuana"—that alone did not constitute an "exigent" circumstance justifying the warrantless search conducted of defendant's "room". *United States v. Rubin, supra.* In the instant case the search was not limited to a particular place as in *Wiley.* Unlike both *Wiley* and *Rubin,* no facts were present in the instant case from which the officers could reasonably conclude that defendant had compatriots at or in the immediate vicinity of the situs of the search who were threatening to destroy, conceal or remove the marijuana. There was nothing by way of evidence presented at the pre-trial hearing that even intimated that the officers reasonably believed that destruction, removal or concealment of contraband material was imminent or threatened. The very most that can be said is that defendant's parents were upset and distraught. As might be expected when their son was awakened from his sleep and arrested at 1:30 in the morning, the atmosphere in the basement "room" was charged with emotional tension. But there is not one scintilla of evidence that defendant's parents were other than law abiding citizens, and the record is devoid of any evidence linking them to the marijuana. The facts disclosed that defendant's parents were cooperative in every respect and made no effort to in anyway thwart the officers. In the absence of any evidence that one or both of defendant's parents were known by the officers to be persons of disreputable character, or compatriots of their son regarding possession of the marijuana, this court is unwilling to say that the mother's weeping and the father's upset condition, alone, was sufficient to cause the officers to conclude or infer that the parents posed a threat with reference to concealment, removal or destruction of the marijuana. The state made no effort to show that undue delay would be encountered in obtaining a search warrant, or that one or several of the officers would be subjected to possible danger if they remained in defendant's "room" while one of the other officers sought to procure a search warrant. Since the record discloses that the officers appearance at the residence in question during the wee hours of the morning was part of a general drug raid conducted in Clay County, this court, in the absence of evidence to the contrary, is not willing to infer that a search warrant could not have been timely obtained. In view of the particular circumstances of this case, if difficulty in obtaining a search warrant, because of possible inconvenience to an issuing magistrate, standing alone, is held to rise to the dignity of a constitutional exigency, then law enforcement officers, by the simple expedient of launching widespread raids and searches at nighttime, could circumvent the Fourth Amendment in a manner never envisioned by its drafters.

This court holds that the state did not carry the burden [*Vale v. Louisiana, supra,* 399 U.S. at 34, 90 S.Ct. at 1972, and *Chimel v. California, supra,* 395 U.S. at 762, 89 S.Ct. at 2039] of showing that the circumstances surrounding the warrantless search rose to

the level of constitutional exigency. Therefore, the state's effort to sustain the warrantless search on the basis of the existence of "exigent" circumstances must fail. At best, the state's evidence showed that what appeared to the officers to be a leaf or stem of marijuana tacked above defendant's bed triggered off, however well meaning, an unmitigated fishing expedition for evidence totally unconnected with the charge for which defendant was arrested, and one that cannot be condoned, in light of its "concrete factual context", on the theory that it was justified by the existence of constitutionally exigent circumstances.

Attention is now directed to the state's final argument that the warrantless search should be upheld as a consensual search. As previously noted, the state at the pre-trial hearing on defendant's motion to suppress advised the court that it was not contending that the search could be justified as a consensual search, conceded that the defendant's evidence showed that he had exclusive possession of the basement "room", made no attempt on direct or cross-examination to show otherwise, and by various objections effectively precluded defendant from introducing evidence that the ostensible consent given by his father was involuntary. Can the state now belatedly contend that the search was consensual? Fundamental concepts of fairness and technical procedural rules imbuing our system of criminal justice would seem to say no. See *Giordenello v. United States*, 357 U.S. 480, 487–488, 78 S.Ct. 1245, 1250–1251, 2 L.Ed.2d 1503, 1510–1511 (1958) and *Osborne v. United States*, 351 F.2d 111, 120 (8th Cir. 1965), and compare *State v. Stevens*, 467 S.W.2d 10, 18 (Mo.1971), where the court stated that "[i]t is the procedural rule in this state that reasons urged in a brief which were not advanced to the trial court are of no avail . . . Such rule serves a legitimate state interest in the trial of a criminal case in that it prevents an accused from trapping the trial court by presenting to it an unmeritorious reason in support of an objection, and then presenting an entirely different reason to the appellate court." Be that as it may, the third exception urged by the state in support of the warrantless search, i. e., that it was a consensual search, may be disposed of on its merits without resort to fundamental concepts of fairness or technical procedural rules. Authority to justify defendant's father's ostensible consent for the officers to search the "room" does not rest upon the law of property and its many historical and legal ramifications, but rests on whether defendant's father had retained the right of joint access to and joint control over the basement "room" rented and occupied by defendant "for most purposes", so that defendant could be said to have assumed the risk that one or the other of his parents might well consent to a warrantless search of the basement "room". *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), and *United States v. Heisman*, 503 F.2d 1284, 1288 (8th Cir. 1974). The only evidence touching upon this question came from defendant's father who testified that the basement "room" was "exclusively" the defendant's "area" and "no one else had a right to be there". The state obviously concluded, during the course of the pre-trial hearing, that defendant's father lacked the requisite authority to give any constitutionally binding consent to the warrantless search of the basement "room", since it made no effort to counter defendant's evidence in the respect just mentioned. Vestiture of authority in defendant's father to consent to the officers' search of defendant's "room", *United States v. Matlock, supra*, and *United States v. Heisman, supra*, as well as the voluntariness of the consent relied upon, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), were both essential to uphold the warrantless search on the theory that it was consensual, and the burden rested upon the state, *Vale v. Louisiana, supra*, and *Chimel v. California, supra*, to prove both essentials by a preponderance

of the evidence, *United States v. Matlock, supra.* The state failed to come forward with sufficient evidence to enable this court to hold that the warrantless search in question fell within the consensual exception.

 The fact that defendant was in lawful custody by virtue of a validly issued arrest warrant at the time the unreasonable search took place did not ostracize him from the protective umbrella of the Fourth Amendment. The suppression of evidence resulting from unlawful searches is not a judicial exercise designed to frustrate those charged with enforcement of our laws; it is nothing more and nothing less than judicial compliance with the positive mandate of the Fourth Amendment that all citizens, the guilty and innocent alike, shall not be subjected to unreasonable searches and seizures. In spite of a popular notion in some quarters that the avowed purpose of the Fourth Amendment can no longer be reconciled with the course of modern day society, the people have not seen fit to eliminate or rewrite it. Its wording today is the same as when it was originally written and adopted. The people wrote and adopted the Fourth Amendment, and they alone possess the power to eliminate or rewrite it. To date, in their innate wisdom, they have not seen fit to do either. Courts are charged with the solemn obligation of upholding the Fourth Amendment. They are powerless to eliminate or rewrite it. Although a multitude of cases construing and applying the Fourth Amendment may at first blush appear to some to be a verbal symphony of confusion and contradiction, a careful scrutiny of the facts of each discloses a dedicated and conscientious effort to carry out its mandate—"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . . ." In an effort to do no less, this court finds and holds that the search complained of was constitutionally offensive and the trial court erred in overruling defendant's mo-

tion to suppress and in admitting the controversial marijuana into evidence.

Since it is patently obvious that the state can not make a case against defendant as charged in the information absent use of the marijuana that was seized during the warrantless search, the judgment is reversed and the defendant is ordered discharged.

All concur.