**UNITED STATES of America,**
**Appellant,**

v.

**Paul Gary RUBIN et al.**
**UNITED STATES of America,**
**Appellant,**

v.

**Louis Martin AGNES a/k/a Louis Martin.**
**Nos. 72–1689, 72–1690.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 15, 1972.

Decided Feb. 13, 1973.

---

Jeffrey M. Miller, Asst. U. S. Atty., Philadelphia, Pa., for appellant.

Jonathan W. Miller, Defender Assoc. of Philadelphia Federal Court Division, Philadelphia, Pa., and Robert F. Simone, Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal deals with the nettlesome question of whether there were exceptional circumstances present to justify a warrantless search of a dwelling.

United States Customs agents entered a house and garage in Philadelphia without a warrant on July 28, 1971, and seized 90 pounds of hashish. Appellees Agnes and Agran, indicted for various offenses connected with importation of the hashish, successfully moved to suppress the seized evidence in the District Court for the Eastern District of Pennsylvania. The Government has appealed the suppression pursuant to 18 U.S.C. § 3731. We vacate the order and remand.

The facts surrounding the warrantless search are set out in the district court opinion: [1]

Sometime during the month of July, 1971, federal customs agents received reliable information that a bronze statue containing a large shipment of illicit drugs, from a point somewhere in Europe, would be shipped to a hospital in this area. As a result of this information, agents or 'look-outs' were posted at the Philadelphia International Airport and the waterfront. On or about July 26, 1971, a crate, answering the general description given to the agents by the informant, was delivered to the Airport. Thereafter, Federal customs agents inspected the crate and statue; they then removed a small sample of the contents for chemical analysis. This sample was confirmed to be 'hashish', a controlled substance under Title 21, United States Code, Section 841(a)(1). The statue contained approximately ninety (90) pounds of 'hashish'; it was addressed to Dr. Daniel Sill of the Board [sic] Street Hospital; Dr. Sill is not a co-defendant to this action. Thereafter, the crate was resealed and placed under constant surveillance. Subsequently, and as expected, a pickup was made on July 28, 1971, at approximately 4:00 p. m., by two men, one of whom was identified as Louis Martin Agnes (A/K/A Louis Martin), a defendant herein. The crate was taken from the Airport by defendant Louis Agnes, by car, to 1819 S. 9th Street in Philadelphia, where it was unloaded at about 5:00 P.M.* Shortly

* It should be noted at this juncture that the agents involved had prior to the pick-up of the statue identified Louis Martin Agnes as a possible suspect and had placed the house under complete surveillance on the date in question, at approximately 10:30 A.M., some 5 hours before the statue arrived at the South Ninth Street address. [District court's footnote 2.]

thereafter, a custom's agent was dispatched at approximately 5:10 P.M.

on July 28, 1971, to prepare and procure a search warrant. Subsequently, defendant Agnes left the South Ninth Street address at about 6:00 P.M., without the crate, but in his car. He was, of course, placed under surveillance. During this surveillance, Agent Bergin testified that 'it appeared to us that the vehicle [Agnes' car] was becoming evasive and aware we were behind it, and we stopped it and took the operator in custody.' The actual arrest occurred at a gasoline station (some six blocks from Agnes' home), between 6:20 and 6:30 p. m. As he was being taken into custody, Agnes yelled to the gas station attendants and spectators, 'Call my brother'. The agents testified that at this point they reasonably believed that there existed the 'threat of destruction' to the 'hashish', which had been delivered to defendant Agnes' home. Thus, the agents proceeded to enter defendant's home in order to preserve the evidence contained therein. Once inside, the officers found the co-defendants, Earl Melvin Agran, Paul Gary Rubin, and Jan Massaar, in the process of packing the 'hashish' for possible distribution; all were arrested and the 'hashish' seized. Of course, the search was made without a warrant, and subsequent to the arrest of defendant Agnes. Upon the arrest of Agnes, Agent Moss abandoned his efforts to procure a search warrant.

The district court rejected the Government's argument that the warrantless search of 1819 South 9th Street was permissible because of the so-called "emergency doctrine." The court, apparently construing a long line of Supreme Court opinions to require that Government officials have knowledge that evidence is actually being removed or destroyed, ordered the seized evidence suppressed.

On appeal, the Government argues that the district court applied too severe a standard in reviewing the warrantless search and that the evidence should be

1. The opinion is reported at 343 F.Supp. 625 (E.D.Pa.1972). Our statement of facts omits the district court's references to the notes of testimony page numbers.

admissible because the agents had a reasonable belief that the hashish they knew was in the residence was about to be destroyed or removed.

Appellees Agnes and Agran maintain that the strict standard applied by the district court was correct. Agnes argues further that he was arrested without a warrant or probable cause, and that this fact also necessitates suppression of the seized evidence. Agran also argues that the evidence must be suppressed because entry first into the front door of 1819 South 9th Street and then into the rear garage door was made without announcement of purpose, in violation of 18 U.S.C. § 3109. Although this issue was not ruled on by the district court, Agran and Agnes had raised it as part of their original suppression motions.

The fourth amendment protects the right of the people to be secure in their homes by providing that search warrants shall not issue "but upon probable cause, supported by Oath or affirmation." Although inferences may be drawn to support the need for a reasonable search, the amendment's protection

> consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Despite the clear preference of the law for searches authorized by warrants, the Supreme Court has recognized several "exceptional circumstances"

> in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with.

Johnson v. United States, 333 U.S. at 14–15, 68 S.Ct. at 369. The Court noted that it might consider "exceptional circumstances" by stating that the circumstances in that case were different from one in which "evidence or contraband was threatened with removal or destruction." [2] 333 U.S. at 15, 68 S.Ct. at 369.

Subsequent to *Johnson*, the Supreme Court has in at least two cases noted that belief that evidence is being destroyed or removed might create an exceptional circumstance justifying a warrantless search. In each, the Court, nonetheless, suppressed the evidence after finding no such circumstances. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). In neither case did the Court find any surrounding circumstances indicating to police officers that the evidence was "likely to be destroyed," McDonald v. United States, 335 U.S. at 455, 69 S.Ct. 191, or faced "imminent destruction, removal, or concealment," United States v. Jeffers, 342 U.S. at 52, 72 S.Ct. 93.

The three recent Supreme Court cases which have sustained use of evidence obtained through warrantless searches offer little guidance as to the exact parameters of the emergency exception. Both Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), setting guidelines for permissible "stop and frisk" procedures, and Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), involving search of the premises into which a felon under "hot pursuit" had fled, were premised on the "exceptional circumstance" that police officers must be able to protect themselves from bodily harm, rather than any Government claim that evi-

---

2. In *Johnson* police had smelled opium fumes outside a hotel room door. The Court noted that they might disappear, but stated such disappearance would be insignificant:

> But they [the fumes] were not capable at any time of being reduced to posses-

> sion . . . The evidence of their existence before the search was adequate and the testimony of the officers to that effect would not perish from the delay of getting a warrant.

333 U.S. at 15, 68 S.Ct. at 369.

dence would be removed or destroyed. Only Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), involved the removal or destruction exception. The Court approved in *Schmerber* a warrantless blood test performed on an automobile driver who had been in an accident and was suspected of drinking. Although the Court found the administration of a blood test was within the area of privacy intrusions protected by the fourth amendment, it said a search warrant was not required because:

> The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system.

384 U.S. at 770, 86 S.Ct. at 1835. Although, if scientific knowledge were imputed to the officer in *Schmerber*, it could be said he had knowledge that evidence was actually being destroyed, the Court spoke of "threatened" destruction. It would seem unwise to put undue emphasis on use of the word "threatened" in *Schmerber*. At the same time, however, it cannot be said that the Court was requiring the officer have knowledge evidence *was* in the process of destruction before any warrantless search could be approved.

The district court relied on three recent Supreme Court opinions, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L. Ed.2d 409 (1970), and Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), in suggesting that actual knowledge that evidence was being destroyed or removed was required under the emergency exception. Although we recognize that each of

these cases speaks of the high standards of exigency which must be present to justify warrantless searches, we cannot agree with the district court that these cases allow "emergency" justification only when the searching officers have knowledge that evidence is actually being removed or destroyed.

Three police officers arrived at petitioner's home in *Chimel,* armed with an arrest warrant based on the burglary of a coin shop. Chimel was arrested when he returned from work, and, despite his objection, the officers conducted an extensive search through the house seeking the stolen coins. In finding this search incident to an arrest unjustified, the Court said:

> The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. . . . The scope of the search was, therefore, 'unreasonable' under the Fourth and Fourteenth Amendments, and the petitioner's conviction cannot stand.

395 U.S. at 768, 89 S.Ct. at 2043.

Chimel's wife was present at the time of the arrest and search. Dissenting, Justice White therefore argued that exigent circumstances justifying a warrantless search existed because of the combined facts of an arrest and the risk that evidence could be destroyed by the wife before a search warrant could be procured. In light of the dissent, it may perhaps be argued that *Chimel* can be read to reject the contention that warrantless searches are justified to prevent a *threatened* destruction or removal of evidence. Such a reading, however, would misconstrue both the facts present in, and the rationale behind, the majority decision of *Chimel*. In *Chimel* the police had had time to obtain an arrest warrant. There was no showing that it would have been "unduly burdensome" for the police to have also obtained a search warrant. 395 U.S. at 768 n. 16, 89 S.Ct. 2034. No emergency had oc-

curred during the arrest to indicate to the officers that removal or destruction of evidence was imminent or threatened. The Court recognized the exceptions allowing warrantless searches, but found that none of them applied. 395 U.S. at 763 n. 8, 763 n. 9, 89 S.Ct. 2034. The thrust of *Chimel* was that the arrest of a man at home could not justify a search of his entire house. Nowhere in the majority opinion does the Court suggest that the emergency exception for the *threatened* destruction of evidence was not still recognized as sound law.

A search warrant was found invalid by the Court in *Coolidge.* The Court thus measured the validity of three searches of an automobile, which had been parked in defendant's driveway and was then towed to the police station, by the standards for warrantless searches. One of the state's theories for upholding the validity of the search was that an automobile may be searched without a warrant anytime there is probable cause, because of the danger that it will be removed. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The Court rejected this contention because the facts made it clear that there was no reason to believe the automobile would be moved before a warrant could be obtained. Coolidge v. New Hampshire, 403 U.S. at 460–464, 91 S.Ct. 2022. The defendant was in custody; his wife, the only other adult occupant of his home, was not at home, and was, in fact, in the company of two policemen until after the time when the car was towed away. The Court was careful to note that under different facts, a warrantless search might have been justified:

> Of course, if there is a criminal suspect close enough to the automobile so that he might get a weapon from it or destroy evidence within it, the police may make a search of appropriately limited scope. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed. 2d 685.

403 U.S. at 461 n. 18, 91 S.Ct. at 2035. The holding in *Coolidge* therefore was that when there is not even a reasonable threat that evidence could be destroyed, a warrantless search cannot be justified. There is, however, no requirement that officers have knowledge of destruction taking place to justify a warrantless search.

The district court relies most heavily on Vale v. Louisiana, 399 U.S. 30, 90 S. Ct. 1969, 26 L.Ed.2d 409 (1970), in suggesting that knowledge of the actual destruction or removal of evidence is required to sustain a warrantless search.[3] Although the Court had always spoken of "threatened" destruction or removal of evidence in previous cases involving the emergency exception, in *Vale*, 399 U.S. at 35, 90 S.Ct. 1969, it spoke for the first time of goods "in the process of destruction." Although the language might suggest that the emergency exception must be construed to require knowledge that the evidence is actually being removed or destroyed, the omission of a single word should not be given such significance, especially in light of the facts in *Vale.* Officers with two warrants for Vale's arrest were watching his house when they saw him perform various acts that appeared to the officers to involve sales of narcotics. They arrested Vale on his front steps and proceeded to search his house. The Louisiana Supreme Court had found the seized narcotics admissible evidence because such evidence is so easily removed or destroyed. The United States Supreme Court rejected this reasoning, stating:

> [B]y their own account the arresting officers satisfied themselves that no one else was in the house when they first entered the premises.

399 U.S. at 34, 90 S.Ct. at 1972. The facts did not support a belief by the arresting officers that there was even a "threatened" destruction or removal of the narcotics. No exigent circumstances justifying the search existed. Further

---

3. *Vale* is read the same way in Note, Police Practices and the Threatened Destruction of Tangible Evidence, 84 Harv.L.Rev. 1465, 1468 (1971).

supporting suppression of the evidence in *Vale* was the lack of any evidence suggesting that "it was impracticable for them [the officers] to obtain a search warrant as well" as the arrest warrants which they did obtain. 399 U.S. at 35, 90 S.Ct. at 1972.

We have extensively reviewed the Supreme Court cases dealing with the emergency circumstances exception allowing warrantless searches to prevent removal or destruction of evidence. We find no requirement that officers must know of the removal or destruction in order to make the search. We are nonetheless obliged to explore the standard by which warrantless searches under emergency circumstances should be judged.

■ The fourth amendment does not forbid all searches and seizures but only such as are unreasonable. The Supreme Court in *Schmerber* observed that the fourth amendment's proper function is "to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." 384 U.S. at 768, 86 S.Ct. at 1834. Thus, judging the legality of warrantless searches involves, as emphasized in *Johnson*, a delicate question of balancing the rights of the individual to be secure in his home against the interest of society in preventing the disappearance of evidence necessary to convict criminals. The strong individual interest has demanded there be "only . . . a few specifically established and well delineated exceptions" to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. at 455, 91 S.Ct. at 2032. The emergency circumstances exception is "established," but it has not been "well delineated." The Supreme Court has never spoken in a case such as this one where the searching officers know there is in fact a large quantity of contraband narcotics in a dwelling, and they are apprehensive that it may be removed or destroyed.

■ Many lower federal courts have, however, grappled with the problem of whether warrantless searches were justified by emergency circumstances. From their rulings, a framework within which to evaluate the circumstances in the present case can be established. Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient. Probable cause must exist to support *any* search; the role of the warrant-issuing magistrate is to determine whether probable cause exists. Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant.

■ When Government agents, however, have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant, *compare* United States v. Pino, 431 F.2d 1043, 1045 (2d Cir. 1970), *with* Niro v. United States, 388 F.2d 535 (1st Cir. 1968); (2) reasonable belief that the contraband is about to be removed, United States v. Davis, 461 F.2d 1026, 1029–1030 (3d Cir. 1972); Hailes. v. United States, 267 A.2d 363 (D.C.C.A.1970); (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought, United States v. Pino, 431 F.2d at 1045; (4) information indicating the possessors of the contraband are aware that the police are on their trail, United States v. Doyle, 456 F.2d 1246 (5th Cir. 1972); and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and

to escape are characteristic behavior of persons engaged in the narcotics traffic," United States v. Manning, 448 F.2d 992, 998–999 (2d Cir. 1971); United States v. Davis, 461 F.2d at 1031–1032. In most cases where warrantless searches were not suppressed, a warrantless arrest was also involved. The present case is unique because the customs agents had no intention of making arrests when they entered the Agnes house, and the Government does not attempt to justify the search as incident to an arrest. The relevant criteria in determining whether the entry was constitutional, however, are similar.

■ A review of the facts surrounding the entry into the house and garage at 1819 South 9th Street convinces us that the customs agents "might reasonably have believed that [they were] confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" Schmerber v. California, 384 U.S. at 770, 86 S.Ct. at 1835. The agents possessed more than enough information to establish probable cause that hashish was on the premises. Their inspection at the airport revealed hashish in the life-sized bronze bust statue, and the close trailing of the statue from the airport to the garage attached to Agnes' home established its presence there. The agents also possessed information that the statue had been broken open by the time of the search, as "kief," a form of hashish, was found all over Agnes' clothes when he was arrested. They therefore could reasonably conclude that distribution of the hashish was in progress.

Although the agents conducting surveillance of the Agnes house had no information connecting the subsequently arrested defendants found in the garage with the narcotics trade, the agents were aware that men were in the Agnes household at the time the decision to search was made. At least one of them had been seen with Agnes at the time he backed his automobile into his garage with the crated statue in the trunk.

The agents therefore could reasonably conclude that at least this person was involved in the narcotics operation.

Agnes intentionally pulled into a gasoline station a half dozen blocks from the searched premises, where it appeared to the agents he was known to some of the persons present. When arrested, he yelled, "Call my brother." It was not unreasonable for agents to believe that this might well be a signal to alert persons still at 1819 South 9th Street of Agnes' arrest and of imminent police intervention into their activities, even though the agents did not see a telephone call made and had no knowledge of the existence of any brother of Agnes. The nature of the narcotics business necessitates rapid distribution of goods in order to prevent apprehension. Hashish is easily destroyed. Agnes was apprehended in the neighborhood of his home and apparently in the presence of people whom he knew. Earlier in the day other individuals had been observed entering and leaving his home. The delivery at the airport of the bronze bust filled with hashish had all the characteristics of a sophisticated operation. Although the agents had been watching both doors of the Agnes home, they could not be certain of how quickly the contraband could be destroyed or what surreptitious means might be available for its removal. The agents had reasonable grounds to conclude that in light of the emergency, it was necessary to enter the premises without awaiting the search warrant.

■ Appellees argue that the search was unreasonable because the agents at the house did not find out from Agent Moss, who had been sent to obtain a warrant, how soon he would accomplish his task. When Agnes was arrested about an hour later, Agent Moss had not yet returned. Appellees argue that Moss could have returned with a warrant within a short time, thus preventing the need for a warrantless search. Considering all the circumstances, however, the agents could reasonably have concluded that even a short wait might

have been too long. An urgent emergency had arisen due to Agnes' arrest and apparent signal. Warrantless searches have been struck down when the police have without justification not used the time available to seek a warrant. That was not the case here. When the crate was picked up at the airport, the agents were uncertain as to its destination. As soon as it did reach 1819 South 9th Street, they began the process of seeking a warrant. Only because exigent circumstances developed about an hour later did it seem necessary to act without awaiting the delivery of the warrant.[4]

We do not minimize the historic and essential importance of the fourth amendment's protection in shielding the citizen from unwarranted intrusions into his privacy. The strong preference of the Constitution for searches pursuant to warrants is clear. Only the emergency circumstances here justified the entry into Agnes' house. These circumstances were sufficiently compelling in tipping the delicate balance in favor of protecting societal interests. Our vigilance in protecting the privacy of the individual in his home must not absolutely preclude officers of the law, when they are confronted with exigent circumstances, from effective criminal investigation and law enforcement in curbing illegal narcotics traffic. We therefore vacate the district court's holding that the evidence seized at 1819 South 9th Street must be suppressed because of an unconstitutional search.

Although we vacate the district court's order, we cannot finally dispose of appellees' contentions. Both in the district court and here, appellees have also claimed that the entry into both house and garage were illegal because of the failure of the agents to announce their purpose and because of their forcible entry without a prior refusal of entry by the occupants, in violation of 18 U.S.C. § 3109.[5] The district court, however, did not rule on this issue; and the Government has not briefed the issue on appeal. We therefore remand the case to the district court for a ruling on this issue and its effect on the admissibility of the seized evidence. Appellee Agnes' further claim that his warrantless arrest was made without probable cause is without merit.

The order of the district court will be vacated and the case remanded for further disposition consistent with this opinion.

---

4. It might be noted that the agents could have seized the contraband and arrested Agnes at the airport, when he picked up the statue. No warrant would have been necessary at that time.

5. 18 U.S.C. § 3109 provides:
   The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.