### UNITED STATES of America

v.

### Jesse Lee ROUNDTREE.

### No. C–CR–88–60–02.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 13, 1988.
As Amended Nov. 28, 1988.

H. Thomas Church, Charlotte, N.C., for plaintiff.

Kenneth P. Andresen, Charlotte, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's Objections to the Magistrate's Memorandum and Recommendation ("M & R") filed August 19, 1988. Defendant's objections were timely filed on August 24, 1988.

A hearing on Defendant's Objections was held in Asheville, North Carolina on September 6, 1988. H. Thomas Church, Assistant United States Attorney, represented the Government, and Kenneth P. Andresen, Esq., represented Defendant.

The facts are adequately set out in the Magistrate's excellent, well-written and well-reasoned M & R, and it would not serve any purpose for the Court to repeat them here, except as may be necessary to this opinion.

Essentially, the issue, as stated in the Government's Answer to Defendant's Objections, filed August 31, 1988, is whether, at the time the officers entered the dwelling at 6915 Idlewild Road, exigent circumstances, which were not created by the Government, existed that justified the warrantless entry.

Briefly the facts of this case are that the police officers had arrived at the Charlotte Law Enforcement Center at 11:30 a.m. with Brenda Faye James whom they had arrested at the Charlotte Airport at 10:41 a.m. with what they thought to be cocaine destined to be delivered by her to 6915 Idlewild Road. At the Law Enforcement Center the police chemist determined that the white powder carried by Brenda Faye James was in fact 960 grams of cocaine.

The chemist then removed the cocaine from the two plastic bags Ms. James had carried and replaced it with one gram of cocaine in each bag, plus white powder, all of which required about forty-five minutes.

The officers then took Ms. James to the Idlewild Road neighborhood, which required thirty to forty minutes, waited twenty to thirty minutes for a taxi for Ms. James and then sent her to 6915 Idlewild Road in the taxi, where she arrived at approximately 1:30 p.m. An unmarked van with eight or nine police officers pulled into the adjacent driveway, and six or seven additional officers were near the scene in other vehicles.

Quoting from Page 1235 of the Magistrate's M & R:

When asked to describe the plan of action for the controlled delivery, Officer Sennett testified as follows:

We had a diagram. We made a decision, that since she was supposed to arrive in a taxicab, that when we got out on Independence Boulevard that we were going to call for a taxicab to meet us out there and then a couple of our agents or officers were going to drive the cab in with her to that address for safety reasons. We also had, I was assigned to drive one of the vehicles which we considered, had most of the officers in it to, [who] *were going to enter the house.* She was instructed that when she went inside, after she was, had given the bag to whoever it was going to be, this James person, that if that person would not let her leave the house that she was to go to the bathroom and lock the door, for her safety reasons, *that we were coming in right after.* If she was allowed to leave the house that she was to ask for cab fare for the cab. And once she got the cab fare she was to leave the bag inside or with that person and come out to the cab and stay at the cab with the officers for her safety.

(emphasis added). It is clear from the emphasized portions of the above testimony that Officer Sennett fully intended, in advance, to enter the house at 6915

Idlewild Road if the controlled delivery was successful. Other parts of his testimony confirm his conclusion, specifically the following:

[Before the controlled delivery]

We went out there and stopped short on Independence Boulevard, just short of that intersection in the parking lot. We called for a uniformed officer to meet us out there. *We always take a uniformed officer on searches with us.*

.      .      .      .      .

Defense Counsel: Had you given her instructions as to what to do if she were permitted to leave the dwelling?
Officer Sennett: She was to come back to the cab.
Defense Counsel: And do what?
Officer Sennett: Stand there. We would make the decision or we would—
Defense Counsel: You had already made the decision to go in—
Officer Sennett: Well, we—
Defense Counsel: —regardless of whether she stayed in the house or came out.
Officer Sennett: If she—well, we were going to go in ....

(emphasis added).

Officer Sennett's testimony and the large force of police demonstrates clearly that the police intended from the beginning and before they left the Law Enforcement Center to enter the house. It can hardly be contended therefore that the entry into the house was because of exigent circumstances.

Exigency arises because of urgency, or a situation calling for immediate action. This was a well-planned operation with the obvious intention of entering the premises at 6915 Idlewild Road before leaving the Law Enforcement Center.

The testimony by the Government was that because of purported concern for Ms. James' safety and that the "cocaine" would be flushed down the toilet, the police entered the house and "secured" it and then

went to obtain a search warrant and returned with it approximately 1 hour and 45 minutes later.

As pointed out by Defendant's attorney at the hearing on Defendant's Objections the affidavit by Officer Sennett in his application for a search warrant contains the same information he had before he entered the premises, with perhaps the exception that he did not know about the BMW, the time of delivery by Ms. James and what was actually found in the house after it was entered, without a warrant.

The first 10 amendments, including the Fourth Amendment to our Constitution, was insisted upon by the legislatures of the states of the newly formed union because of their experience with the unlimited power of kings to invade private dwellings without any restrictions. It is a sacred and essential part of our freedom which should be protected. If we do not protect the sanctity of the dwelling, we all suffer a loss of one of our freedoms protected by the Constitution.

Having said that, the Court does not wish to indicate that this Court has any intention of "arm chair quarterbacking" and nit-picking every warrantless entrance of a home by police. Police are on the line and often have to make decisions as circumstances develop without the benefit of quiet reflection in a judge's chambers. Police should have as little restriction as possible placed upon them in their efforts to enforce the law and to apprehend criminals. However, the police are, as all of us are, required to abide by our Constitution, and in this case this Court feels that they did not.

Here was obviously a situation where the police knew, and by Officer Sennett's testimony intended, that they would enter 6915 Idlewild Road. Further, they were at the Law Enforcement Center for at least 45 minutes where Magistrates were readily available to issue a warrant. They knew the address of the property. They knew that cocaine would be delivered. They knew the address was a source for drugs being dis-

tributed in the Charlotte area. They knew that the cocaine was to be delivered to one "James."

This is a classic "search first, warrant later" case. On the entry without a warrant, the officers learned that there was a white powdery substance and a marijuana-looking substance together with cash and a pistol on the bed in one of the bedrooms, and that in the den area, there was a white powdery substance and marijuana in clear plastic bags on a coffee table. Then, Officer Sennett in his affidavit applying for a search warrant stated: "In plain view of myself and other Vice Officers, I saw what I believed to be additional amounts of cocaine and marijuana."

Thus, the evidence sought to be suppressed was not found for the first time during the execution of the search warrant, and is therefore not admissible.

After considering the factors which the Fourth Circuit has said are relevant to determining whether exigent circumstances exist, this Court finds that the circumstances here did not have the urgency which required the immediate entry into the house without a warrant. *United States v. Turner,* 650 F.2d 526 (4th Cir.1981).

There was no contraband known to the police which could be destroyed other than the two grams carried by Ms. James.

With approximately 15 police surrounding the house there was little possibility of danger to the police if they had maintained their surveillance.

There was no indication to the police that the possessors of the "white powder" were aware the police were present.

There was no likelihood that the "contraband" could be destroyed since the police had possession of all but two grams of it.

In summary, the Court simply does not find that exigent circumstances existed to authorize the entry without first obtaining a warrant.

## MOTION TO DISMISS

Defendant has moved that the Indictment be dismissed as having been the product of an unlawful search and seizure of the person of Jesse Lee Roundtree in violation of the Fourth Amendment. The Indictment charges that Defendant Roundtree "did knowingly, willfully, and unlawfully attempt to possess with intent to distribute, 960 grams of cocaine ..."

Clearly, the evidence of his intent to possess the 960 grams of cocaine which was to be delivered to him was not the product of a search of 6915 Idlewild Road, and, therefore, Defendant's Motion to dismiss the Indictment on that charge will be denied.

As to Count Three of the Indictment charging Defendant Roundtree with using a firearm *in relation to the commission of* the attempted possession with intent to distribute cocaine, the Court will not dismiss that Count, but will suppress the evidence of the gun, if it is the same gun seen by Officer Holt on the bed in the initial search of the premises before a warrant was secured, and reported to Officer Sennett.

NOW, THEREFORE, IT S ORDERED:

(1) The Magistrate's Memorandum and Recommendation is REVERSED.

(2) Defendant's Motion to Suppress all items seized from 6915 Idlewild Road, Charlotte, North Carolina, on May 12, 1988 is GRANTED.

(3) Defendant's Motion to Suppress items found in the BMW pursuant to the search warrant is DENIED.

(4) Defendant's Motion to Dismiss the Indictment is DENIED.

## APPENDIX

### MEMORANDUM AND RECOMMENDATION

#### August 19, 1988.

PAUL B. TAYLOR, United States Magistrate.

THIS MATTER is before the Court upon the Defendant's Motion to suppress certain evidence that was obtained as a result of an allegedly illegal search and seizure at the time of his arrest. On July 27, 1988, the undersigned Magistrate conducted a hearing on this Motion. Upon the evidence produced at the hearing, the arguments

and briefs of counsel, and pertinent legal authorities, the undersigned Magistrate herewith enters the following findings of fact, conclusions of law, and recommendation.

## I. Findings of Fact

The facts of this case are largely not in dispute. Officer Gerald P. Sennett of the Charlotte Police Department testified that in mid-April of 1988, Charlotte Police Department narcotics officers arrested Bridgette Weston at the Charlotte airport after a routine drug courier profile surveillance uncovered one pound of cocaine in her possession. Subsequent to her arrest Ms. Weston cooperated with police officers and informed them that she had been instructed to deliver the cocaine to a house at 6915 Idlewild Road in Charlotte. Ms. Weston also informed the officers that there were weapons inside the house at 6915 Idlewild Road. On the basis of this information, the officers attempted a controlled delivery of the cocaine but were unsuccessful when it turned out that no one was at the address to answer the door or receive the package of cocaine.

Approximately one month later, on May 12, 1988, Officer Sennett was engaged in routine drug courier profile surveillance at the Charlotte airport. As a result of this surveillance, Officer Sennett arrested Brenda Faye James as she deplaned a Ft. Lauderdale flight in Charlotte with 960 grams of cocaine. After her arrest, Ms. James agreed to cooperate with the police and informed them that she had received the cocaine from a Donald Washington (or Postell) in Miami that day and was to receive $1,000.00 for delivering it to a house at 6915 Idlewild Road in Charlotte. She had been instructed to ask for a cab driver named Willie at the Charlotte airport. If she could not find this cab driver, she was to take another cab to the Idlewild Road address and give the luggage containing the cocaine to a black male known to her as "James." She also told the police that she was to wait at the apartment for a short while and then accompany "James" with the cocaine to another location where Postell and Washington, who were to arrive on

a later flight, would come to pick up the drugs. Brenda Faye James described the "James" she was to deliver the cocaine to as a tall and skinny black male in his twenties. He had previously been introduced to her in Miami as a cousin of Donald Washington (or Postell). After providing the police officers with this information, Ms. James agreed to assist the officers in making a controlled delivery of the cocaine to the 6915 Idlewild Road address. At the time he arrested Ms. James, Officer Sennett recalled and was aware of Ms. Weston's arrest one month earlier and the unsuccessful attempted controlled delivery to the 6915 Idlewild Road address.

Ms. James' arrest took place at the airport at 10:41 a.m. on May 12, 1988. At 11:30 a.m. that same day, the police officers arrived at the Charlotte Law Enforcement Center and took the cocaine to the police laboratory for analysis. At this time, Police Chemist Tony Aldridge determined that the white powder carried by Ms. James was, in fact, 960 grams of cocaine. Mr. Aldridge then removed from the two plastic bags Ms. James had been carrying all but one gram of real cocaine in each bag. The laboratory officer then placed a fake white powder back into the two plastic bags to fill them up to their original volume. Officer Sennett testified that he has been a police officer for nine years with the last three-and-a-half years in the narcotics unit. In his opinion, the false material placed in the bags did not look like real cocaine because it was white and powdery and did not have the characteristic crystalline chunks which would be found in typical cocaine deliveries. Officer Sennett further stated that, in his experience, the false material in the bags looked so unlike cocaine that an experienced drug dealer would immediately recognize the substance as fake and would become suspicious of the delivery. However, Officer Sennett also explained that, "due to the time limit, it was all that [the police chemist] had at the time," and that "it was the only thing he had in that mass. We're looking at a kilo he had to make up with. 960 grams is a lot of cut to have at one time and he used

several different substances to try to get the texture and the color consistent with cocaine."

After forty-five minutes at the police laboratory, the officers took Ms. James to the vicinity of the Idlewild Road address. The trip from the Law Enforcement Center to the Idlewild Road neighborhood took approximately thirty to forty minutes. Once in the neighborhood, the officers had to wait an additional twenty to thirty minutes for a taxi to arrive to take Ms. James to the house at 6915 Idlewild Road. At approximately 1:35, nearly three hours after her arrival at the Charlotte airport, Ms. James arrived at the Idlewild Road address.[1] An unmarked van containing eight or nine police officers pulled into an adjacent driveway.[2] From their vantage point, the officers could see a white BMW automobile in the driveway of the 6915 Idlewild Road house. This fact was significant to the officers because Ms. Weston had told them at the time of the first attempted controlled delivery that a white BMW had been used by the occupants of the house for drug deliveries.

When asked to describe the plan of action for the controlled delivery, Officer Sennett testified as follows:

> We had a diagram. We made a decision, that since she was supposed to arrive in a taxicab, that when we got out on Independence Boulevard that we were going to call for a taxicab to meet us out there and then a couple of our agents or officers were going to drive the cab in with her to that address for safety reasons. We also had, I was assigned to drive one of the vehicles which we considered, had most of the officers in it to, [who] *were going to enter the house.* She was instructed that when she went inside, after she was, had given the bag to whoever it was going to be, this James person, that if that person would not let her leave the house that she was to go to the bathroom and lock the door, for her safety reasons, *that we were coming in*

right after.* If she was allowed to leave the house that she was to ask for cab fare for the cab. And once she got the cab fare she was to leave the bag inside or with that person and come out to the cab and stay at the cab with the officers for her safety.

(emphasis added). It is clear from the emphasized portions of the above testimony that Officer Sennett fully intended, in advance, to enter the house at 6915 Idlewild Road if the controlled delivery was successful. Other parts of his testimony confirm this conclusion, specifically the following:

> [Before the controlled delivery]

> We went out there and stopped·short on Independence Boulevard, just short of that intersection in the parking lot. We called for a uniformed officer to meet us out there. *We always take a uniformed officer on searches with us.*

> .    .    .    .    .

> Defense Counsel: Had you given her instructions as to what to do if she were permitted to leave the dwelling?

> Officer Sennett: She was to come back to the cab.

> Defense Counsel: And do what?

> Officer Sennett: Stand there. We would make the decision or we would—

> Defense Counsel: You had already made the decision to go in—

> Officer Sennett: Well, we—

> Defense Counsel: —regardless of whether she stayed in the house or came out.

> Officer Sennett: If she—well, we were going to go in. . . .

(emphasis added).

The officers had "wired" Ms. James with a microphone and transmitter so that they could hear her conversations with the occupants of the house. However, as it turned out, the transmission was faulty and the officers were able to hear only fragments of the conversations that took place.

---

1. Under ordinary circumstances, a taxi ride from the Charlotte Airport to the Idlewild Road neighborhood takes approximately 35 to 45 minutes.

2. Six or seven additional officers were near the scene in other vehicles.

At approximately 1:30 p.m., Ms. James exited the taxi and went to the front door of 6915 Idlewild Road. Officer Sennett, who was listening to the transmitter carried by Ms. James could hear the front door open and heard a female voice. Ms. James went into the house and Officer Sennett heard through the transmitter a male voice say, "Hey, I see you finally got here." There were additional unintelligible conversations and then Ms. James came out to the taxi. Ms. James had walked into the house with a small suitcase carrying the cocaine packages (now filled with dummy cocaine). When she emerged, she no longer had this suitcase.

When Ms. James got to the taxi, the officers decided that there was a danger that the occupants of the house would open the suitcase, realize immediately that it contained a dummy substance, would suspect a trap, and then attempt to destroy the evidence. Officer Sennett further testified that it is a common practice among drug dealers to flush cocaine and other similar substances down a toilet when they suspect the police are about to descend upon them, and that he had, on many occasions, raced to bathrooms to prevent such destruction of evidence. Officer Sennett was also concerned that whoever was in the house might even come to the door with a gun in search of Ms. James when she failed to return inside.

As a result of these concerns, Officer Sennett and several other police officers and agents went to the front door of the 6915 Idlewild Road house and yelled, "Police." The front door was standing open but the screen door was closed. The officers could see through the screen door into the house. There was no response to the officers' call of "Police" and so an Office Couch entered the house first, followed by Officer Sennett and other officers. As the first two officers stepped into the foyer, Officer Couch observed a black male down a hallway to the right run into a bedroom. Officer Couch pursued the black male while Officer Sennett went straight forward from the front door into a den area where he saw a black female seated in a chair. The government offered into evidence Exhibit # 1 which was a diagram of the floor plan of the 6915 Idlewild Road house.

Once in the den area, Officer Sennett smelled an odor of marijuana and saw a lit marijuana cigarette next to the female sitting in a chair. The officers further saw that the suitcase in which the cocaine had been delivered was on the floor in the front hall of the house. Officer Sennett went to one of the back bedrooms where he found Officer Couch and the Defendant, Jesse Lee Roundtree. Another police officer, Mike Holt, who had been searching the house for other suspects, came up to Officer Sennett and stated that he saw a white powdery substance and a marijuana-looking substance together with cash and a pistol on the bed in one of the bedrooms. In the den area, the officers discovered a white powdery substance and marijuana in clear plastic bags on a coffee table.

Upon questioning, the black female in the den stated that her name was Priscilla Owens, she was fifteen years old, that she did not live in the house and did not know who lived there. When Officer Sennett asked the Defendant for his name, the Defendant responded, Jesse Lee Roundtree, and stated that he did not live there and did not know who lived in the house. He further stated that he didn't care if the officers searched the house. At this time, Officer Sennett did not believe that the Defendant could give a valid consent to search the house.

After taking the two occupants of the house into custody and holding them in the living room area of the house, Officer Sennett spoke to Brenda Faye James. This conversation took place at approximately 2:15 or 2:30. Ms. James stated to Officer Sennett that a female had let her into the house and that once inside she called out for James. When he appeared, Ms. James handed him the bag containing the cocaine and he stated, "I see you finally made it." Ms. James further stated that this was the same James she had previously met in Florida. James gave her fifteen dollars to pay the taxi driver and she went back out to the taxi. After this conversation with Ms.

James, Officer Sennett returned to the Law Enforcement Center to obtain a state search warrant to search the house. He obtained this warrant at 3:35 p.m. The government introduced into evidence Exhibit # 2 which is a copy of that search warrant.

At 4:10 p.m., Officer Sennett returned to the 6915 Idlewild Road residence with the search warrant. The Defendant and Ms. Owens were still in custody in the house. Officer Sennett read the warrant to the Defendant, and his officers, in accordance with standard procedure, then photographed all the rooms prior to the search. The police then searched all the rooms. As a result of this search, the police uncovered drugs, money, transaction sheets for drug deals, a handgun and other drug paraphernalia. The items specifically recovered by the search were listed in inventory which was introduced into evidence as Government's Exhibit # 3.

When asked why he did not attempt to obtain a search warrant prior to going to the house at 6915 Idlewild Road, Officer Sennett testified:

> Well, I didn't know who owned the house. I didn't know who was going to be in the house. I didn't think I had the—I didn't think I'd be able to get a search warrant, and, plus, I was—timewise we were pushing it from the time we made the delivery anyways. I mean, that was at 1:35 and she came in at 10:10, 10:15.

He further added that he had no independent knowledge that there were any drugs in the house and recalled that at the time of the first attempted controlled delivery with Ms. Weston one month earlier, no one had been at home to answer the door. With regard to the time-frame of the delivery, Officer Sennett testified that, within his experience as a police officer, he was aware that people involved with drugs are usually paranoid and become extremely nervous and dangerous when deliveries are not on time.

Jesse Lee Roundtree, the Defendant, took the stand to testify that on May 12, 1988, he was at the 6915 Idlewild Road address. He further testified that no one ever showed him a search warrant or asked him for permission to search the house. He further stated that he gave the police the name of a woman, a Ms. Sandra Reagan, who owned the house together with Donald Washington. He also gave the police the name of a Graham Street restaurant where Ms. Reagan could be located for permission to search the house.

The Defendant re-called Officer Sennett to the stand and asked him if the Defendant had provided him Ms. Reagan's name. Officer Sennett stated that the Defendant had not provided Ms. Reagan's name or the fact of her ownership of the house until after he returned to the house with a search warrant.

In a subsequent indictment returned by the grand jury, Jesse Lee Roundtree was charged with one count of attempted possession with intent to distribute 960 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and § 846, and one count of using a firearm in relation to the commission of a felony, (the drug charge above) in violation of 18 U.S.C. § 924(c)(1). Brenda Faye James was charged in the same indictment with one count of possession with the intent to distribute 960 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1).

## II.  Conclusions of Law

The central issue in this case is whether the police violated the Defendant's Fourth Amendment rights against unreasonable searches and seizures when they entered the house at 6915 Idlewild Road without a warrant. As will be seen below, if the initial entry was lawful, the police were entitled to make a cursory protective sweep of the premises to determine the presence of anyone who might pose a threat to them. During such a protective sweep, after lawful entry, the police would also be entitled to seize any evidence in plain view. Evidence outside plain view could be seized only after the officers obtained a search warrant for the premises. The focus of this inquiry thus turns to the propriety of the initial entry into the home.

## A. The Warrant Requirement

More than fifty years ago, the Supreme Court emphasized the general prohibition of warrantless searches of private homes. In *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), the Court held that "[t]he search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws.... Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. Any such searches are held unlawful notwithstanding facts unquestionably showing probable cause." 269 U.S. at 32–33, 46 S.Ct. at 6–7 (citations omitted). More recently, in *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), the Court reiterated the longstanding rule regarding warrantless searches of homes:

> It is axiomatic that the "physical entry of a home is the chief evil against which the wording of the Fourth Amendment is directed." And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. It is not surprising, therefore, that the Court has recognized as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable."
>
> Consistent with these long-recognized principles, ... warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances.

466 U.S. at 748–749, 104 S.Ct. at 2096–2097 (citations omitted). The Court has also made clear that, even armed with an arrest warrant for a particular individual, the police may not enter a house in search of that person without a search warrant. *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

In light of these strict principles governing police intrusion into a private home, the question in this case turns to whether exigent circumstances justified the warrantless entry of the house at 6915 Idlewild Road.

## B. Controlled Deliveries

Before turning to exigent circumstances as a ground for entry into a house without a warrant, the Court would first like to address the question of whether in all cases of controlled deliveries of illegal drugs the police have an inherent right to storm the premises immediately after delivery to recover the package and "secure" the premises until a search warrant can be obtained. Examination of the relevant case law indicates that there is no inherent authority for such police action in all cases of controlled deliveries. In the first place, the general prohibition against warrantless home searches discussed above would require a holding that such a search was presumptively unlawful. Secondly, not all controlled delivery situations present the same facts. Some cases will present sufficient advance knowledge and time for the police to obtain a search warrant. Other cases may or may not present exigent circumstances. In a case permitting the seizure of contraband after a controlled delivery, the Second Circuit noted that the items seized were just inside an open warehouse door, but then admonished, "[t]his does not mean that the government should have the general right to make a warrantless search of a private warehouse or dwelling for the purpose of terminating a controlled delivery." *United States v. Singh*, 811 F.2d 758, 761 (2nd Cir.1987). Consequently, there being no inherent right to enter private dwellings without a warrant after a controlled delivery of drugs, the government must show the existence of exigent circumstances.

## C. Exigent Circumstances

As stated in *Welsh, supra*, the Supreme Court has recognized that exigent circumstances, together with probable cause, constitutes a legitimate exception to the warrant requirement. However, the Court further held in that case that

> [p]rior decisions of this Court, however, have emphasized that exceptions to the warrant requirement are "few in number

and carefully delineated," and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.

466 U.S. at 749–750, 104 S.Ct. at 2097–2098 (citations omitted). Professor LaFave has noted in his learned treatise that

notwithstanding the claim [in Supreme Court law] that exceptions to the warrant requirement are "specifically established and well-delineated," it is closer to the truth to say that the "emergency circumstances exception is 'established' but it has not been 'well-delineated.'" 2 W. LaFave, *Search and Seizure*, § 6.5(b), P. 657 (1987).

Professor LaFave then notes that the "most careful treatment" of the exigent circumstances is found in *United States v. Rubin*, 474 F.2d 262 (3rd Cir.1973). *Id.* at 658. The United States Court of Appeals for the Fourth Circuit has recently cited *Rubin* with approval in *United States v. Turner*, 650 F.2d 526 (4th Cir.1981).

In *Turner*, the Fourth Circuit held that the factors relevant to determining whether exigent circumstances exist in a given case are

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant;

(2) the officers' reasonable belief that the contraband is about to be removed or destroyed;

(3) the possibility of danger to the police guarding the cite;

(4) information indicating the possessors of the contraband are aware that the police are on their trail; and

(5) the ready destructibility of the contraband. 650 F.2d at 528 (citing *Rubin*, at 474 F.2d 268–269).

In addition to the above factors, courts have further held that "agents cannot justify their search on the basis of exigent circumstances of their own making." *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983) (citations omitted). *Accord, United States v. Hultgren*, 713 F.2d 79, 86 (5th Cir.1983) ("warrantless searches may not be justified on the basis of exigent circumstances which are created by the government itself.")

In applying these factors to the present case, the Court must initially determine at what time the police first had sufficient information to obtain a search warrant for the house at 6915 Idlewild Road.

Clearly, there was insufficient evidence for a search warrant until the moment at which Ms. James exited the house after leaving the cocaine package inside. Prior to this time, the police had no knowledge that there were any drugs or contraband in the house. Additionally, they had no knowledge as to who resided in the house or whether anyone would be there at all. Finally, they had direct knowledge that a prior attempted controlled delivery to this house had failed because no one was at the house to receive the package. Without evidence of any specific contraband being in the house before the controlled delivery, the officers would not have had anything they could name in a search warrant that they were searching for. Likewise, having no knowledge of the names, or even existence, of persons occupying the house, they would not be able to name in a search warrant any particular persons to be searched for. Having thus no persons or things which they could name to be searched for or seized, the officers had no information about which they could obtain a valid search warrant prior to the time of the controlled delivery.[3]

3. Although the Fourth Circuit has recently approved the practice of obtaining "anticipatory warrants," *United States v. Goodwin*, 854 F.2d 33 (1988); *United States v. Washington*, 852 F.2d 803 (1988), those holdings occurred after the date of the search in this case and, in any event, are clearly intended to *permit*, rather than *require* in all cases, the use of anticipatory warrants. Further, the facts in *Goodwin* and *Washington* involved mail deliveries which prompted

the Court to hold that "where the contraband to be seized 'is on a sure course to its destination, as in the mail, prior issuance of a warrant is *permissible.*'" *Goodwin*, at 36 (emphasis added).

In the present case, the delivery was not by mail, but by a cooperating defendant. Further, a prior attempted delivery to the same house had failed because no one was at home to answer the door or receive the contraband. Un-

Once Brenda Faye James left the house without the suitcase she had carried inside, the police had probable cause to obtain a search warrant. They knew at that time, in addition to the information provided earlier by Brenda Faye James and Bridgette Weston, that there were at least two people in the house who apparently recognized Ms. James and received her and the suitcase containing the cocaine packages. Additionally, the comment heard over the wire that "I see you finally got here," indicated that an occupant of the house had, in fact, been expecting Ms. James and considered her to be somewhat late, thus confirming the pre-existing plan described by Ms. James to the police.

Once the police had this information, they could have satisfied the standards for obtaining a warrant—if they had time. But Brenda Faye James was in the house less than five minutes and once she came out, the officers believed that the occupants of the house would open the suitcase and immediately determine the substance inside to be fake. Further, as Ms. James waited outside by the taxi, the occupants were certain to begin wondering why she had not returned and suspect that something was up.

Turning to the *Rubin* test adopted in *Turner, supra*, the Court finds that, after Ms. James exited the house without the suitcase, a great degree of urgency was created by the possibility that the occupants of the house would immediately open the suitcase, discover the fake substance, and attempt to destroy it by flushing it down a toilet. Additionally, it would have been but a matter of minutes before the occupants began to wonder why Ms. James had not returned to the house, thus prompting suspicions that something was amiss. In the urgency of this situation, there was no time for the officers to drive the 35 minutes, each way, to and from the nearest courthouse to obtain a search warrant. Nor would there have been time for even a telephone warrant pursuant to F.R. Crim.P., Rule 41(c)(2).

Secondly, on the facts presented in this case, it was reasonable for the officers to believe that after Ms. James left the house and did not return within a couple of minutes, the occupants would have suspected a trap and would have attempted to destroy the cocaine packages. Officer Sennett testified that many times in his years as a police officer he has raced to bathrooms in an effort to stop drugs from being flushed down the toilet.

Third, there was a possibility of danger to police guarding the site. The police were aware from Bridgette Weston that the occupants of the house had guns. Further, Officer Sennett testified that he was concerned that someone might come to the door with a gun once the fake cocaine was discovered or Ms. James' absence was noticed.

Fourth, the occupants of the house were certain to discover the false cocaine immediately upon looking inside the package. Additionally, Ms. James' failure to return inside the house would also cause them to suspect that the police were on their trail.

Finally, the cocaine and the dummy substance, a mix of white powders, could easily have been destroyed by being flushed down a toilet inside the house.

Having met the five factor *Rubin* test, the government is then left to explain why and how the exigent circumstances in this case are not the product of police action. After all, it was the police who switched the dummy substance for the real cocaine, and it was the police who instructed Ms. James to leave the house and wait by the taxi, thus creating the possibility that the occupants of the house would immediately suspect a trap and attempt to destroy the evidence, take up their guns, or both. Further, when everything went according to the plan the police had created, with no surprise developments, the question must be asked, how can the police now claim that exigent circumstances permitted them to enter the house without a warrant?

like mail, which is simply left in a mailbox or redelivered when someone comes home, there is no "sure course" in the case of a personal

attempt at delivery when there are no instructions or alternatives in the event no one is at the house at the time of arrival.

The answer lies in the simple fact that this case did not involve a simple, premeditated police plan for a controlled delivery, but rather a counterplan, quickly devised by the police in response to the developing scenario which had been set into motion by the defendants and their allies in Florida. At each step of the scenario, the officers made the only reasonable choice available to them. Upon arresting Ms. James at the airport, the officers made the reasonable decision to seek her cooperation in arresting those to whom the drugs were to be delivered. Indeed, to pass up the opportunity to catch the larger players in this conspiracy would have constituted irresponsible police behavior. However, once Ms. James agreed to cooperate, the officers were bound by the timetable created by Ms. James' arrival time, the travel time from the airport to Idlewild Road, and the expectations of the occupants of the house that Ms. James would arrive according to the plan. Without undue delay, the officers went to the police lab to analyze the substance found in Ms. James' possession and to make up a dummy substance for delivery. Here, the officers made another reasonable decision—in fact, the only decision they could make. There is no question that the officers could not permit Ms. James to carry the real cocaine into the house. If they did, she could simply walk into a bathroom and flush all the evidence against her (and the others) down the toilet. Indeed, it would have been irresponsible for the officers to permit her to take anything but a dummy substance into the house. With regard to the poor quality of the dummy substance, all the evidence indicates that the police acted reasonably in doing the best they could to come up with, on such short notice, a dummy substance in a near-kilogram quantity.

After preparing the dummy substance, the police, again without undue delay, took Ms. James to the vicinity of the Idlewild Road address and arranged to drive her to the house in a taxi. At this point, the officers again acted reasonably and made the only choice available to them. Since Ms. James had previously met "James" in Florida, she had to be the one to deliver the package as planned. However, having become an agent of the police, walking into the house of suspected drug dealers with dummy cocaine and a transmitter presented a situation rife with danger. Consequently, the police had no choice but to instruct Ms. James to get out of the house as soon as possible and to stay out, even if that would cause the occupants to immediately suspect a trap.

When viewed in this manner, this scenario presents a series of choices with but one reasonable course of action at each turn of events. Having chosen the only reasonable options available to them, and working within the time constraints and general plan devised by the drug dealers themselves, the police conduct at all times was reasonable. Consequently, it was the time frame and plan devised by the drug dealers themselves that ultimately led to the exigent circumstances which required the police to enter the house at 6915 Idlewild Road without a warrant.

This conclusion is consistent with holdings of other courts in cases involving warrantless searches after controlled deliveries of contraband. In *United States v. Gallo–Roman*, 816 F.2d 76 (2nd Cir.1987), United States Customs agents intercepted two pieces of mail addressed for delivery in New York which contained cocaine secreted between photographs and false backs. The envelopes were turned over to agents of the Drug Enforcement Administration who removed the cocaine from the photographs and replaced it with a mixture of trace amounts of cocaine and dextrose. After repackaging the photographs, the envelope was resealed and the officers called the telephone number for the post office box that the package was to be delivered to and informed the person on the line that the package was ready for pick-up. Sometime later, someone came to pick up the package and the officers followed this person to a private apartment. After waiting approximately 20 minutes, the officers rang the doorbell and entered the apartment when the door was opened. They did not have a search warrant. Once inside the apartment, the officers discovered the

defendant in the bathroom in the process of flushing part of the cocaine down the toilet.

After recognizing the general principle that "searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances", the Second Circuit found that exigent circumstances justified the warrantless search of the apartment and seizure of the cocaine found therein. In making this decision, the Court ruled that

> it was certainly reasonable for the agents to conclude that, once the envelope was opened, the false backs removed from the photographs, and the discovery made that the photographs had been tampered with, it would become apparent that the scheme had been uncovered and that the authorities were near. Under these circumstances, the agents reasonably could have anticipated that the perpetrator would act quickly to destroy the evidence of unlawful conduct. Therefore, because possible destruction of the evidence was imminent, the agents did not violate the Fourth Amendment in entering and searching the apartment.

816 F.2d at 79. As in the present case, the defendant in *Gallo–Roman* claimed that, since the police had already removed the real cocaine from the package, there was no real evidence to be destroyed during the time that it would take to obtain the search warrant. Rejecting this argument, the Second Circuit held, "that the evidence might only be regarded as additional evidence against someone already identified does not detract from the agents' legitimate purpose of preventing destruction of that evidence." 816 F.2d at 80.

The Second Circuit further noted that the short time period, twenty minutes, between the time that the package was taken inside the apartment and the time the officers entered the dwelling was an insufficient time period to obtain a search warrant, even by the telephonic search warrant procedure set forth in Federal Rules of Criminal Procedure 41(c)(2). 816 F.2d at 80–81.

In *United States v. Hultgren*, 713 F.2d 79 (5th Cir.1983), police officers arranged to have an undercover confidential informant carry a transmitter during a drug transaction. After the informant went into the house where the drug deal was to take place, his transmitter failed. The agents listening to the transmission failure immediately broke into the house and arrested the residents. On these facts, the Fifth Circuit held that "the failure of the transmitter created a genuine concern that the government informant had been exposed and that his life and those of the agents surrounding the house were in danger." 713 F.2d at 88. The court further noted that the failure of the transmitter was not attributable to any action on the part of the agents, and that "the fact that the exigency might have been foreseeable does not control.... The important point is that the exigency, while perhaps not *unexpected*, had not been *created* by the government." *Id.* (citations omitted). To a like extent, in the present case, the fact that the police anticipated, and prepared in advance for, the exigent circumstances which would cause them to have to enter the house, does not mean that the police were the cause of the exigent circumstances.

In *United States v. Edwards*, 602 F.2d 458 (1st Cir.1979), officers followed a man to a private residence after he had picked up a package known to contain heroin at an airport freight office. Outside the private home, the suspect saw and gestured at an FBI agent, known to him, who was surveilling the scene. Shortly after the suspect entered the house, the officers followed through an unlocked door, without a warrant. The officers "secured" the premises by a cursory search for other persons, then held the suspect and one other man under guard until a search warrant could be obtained. Once the warrant arrived, a full scale search uncovered the heroin in a kitchen pantry. On these facts, the First Circuit found that exigent circumstances —a reasonable fear that the suspect's recognition of an FBI agent at the site where drugs were being delivered would precipitate an effort to destroy the evidence—justified a warrantless entry into the house. 602 F.2d at 469.

In *United States v. Glasby*, 576 F.2d 734 (7th Cir.), *cert. denied*, 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 159 (1978), the Seventh Circuit found that exigent circumstances justified a warrantless police entry into an apartment where, after a controlled delivery of heroin and arrest outside a dwelling of one of the suspects, the police officers had reason to believe that the occupants of the apartment were about to destroy the evidence.

In each of the above cases, police action played a role in the developing circumstances which led to an exigent situation. In *Gallo–Roman*, the false backs on the photographs had been detectably altered by the police; in *Hultgren*, it was a transmitter installed by the police which failed; in *Edwards*, the presence of an agent at the scene triggered recognition on the part of one of the suspects; and in *Glasby*, the arrest of a suspect by the police prompted fears of others inside destroying evidence. But also in each case, the police were responding and reacting to a rapidly developing situation, with no time to obtain a warrant, and no reasonable alternative actions which would have averted the rise of exigent circumstances. And in each case, the Circuit Courts held that the warrantless entry of private dwellings was justified by exigent circumstances.

On the basis of the facts of this case and the applicable law, the Court finds that exigent circumstances, which were not the product of unreasonable police action, justified the warrantless entry of the house at 6915 Idlewild Road.

### D. The Protective Sweep, Plain View Search, and Warrant Seizures

After the police have made a lawful arrest or a lawful entry onto premises to effect an arrest, they are permitted to carry out a "protective sweep" of the area to check for other persons who might pose a threat to the safety of the officers or to the public. *United States v. Baker*, 577 F.2d 1147, 1152 (4th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978); *United States v. Owens*, 782 F.2d 146, 151 (10th Cir.1986); *United States v. Digregorio*, 605 F.2d 1184, 1188 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *United States v. Martino*, 664 F.2d 860, 869 (2nd Cir.1981); *United States v. Sheikh*, 654 F.2d 1057, 1071 (5th Cir.1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir.1987). Further, any evidence or contraband which the police discover in plain view during such a protective sweep may be seized and used as evidence. *United States v. Baker*, 577 F.2d 1147, 1152 (4th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978); *United States v. Hultgren*, 713 F.2d 79, 88–89 (5th Cir.1983); *United States v. Standridge*, 810 F.2d 1034, 1038 (11th Cir. 1987).

In this case, after lawfully entering the premises, the police performed a protective sweep of the house, held the two occupants in custody in the living room, and then obtained a search warrant. On the reasoning of the above authorities, all evidence in plain view during the protective sweep is admissible, as is all evidence outside of plain view which was discovered after the officers obtained the search warrant.

The Defendant argues that the search warrant was invalid because it included facts obtained after the police entered the house, particularly observations of drugs in plain view. Since the Court has found the initial entry to have been lawful, the officers were entitled to rely on plain view observations in securing a search warrant for a more thorough search. Further, even if it was improper to include post-entry plain view observations in the warrant application, such additional facts were mere surplusage and not critical in light of the other facts recited for obtaining the warrant. *See, e.g., United States v. Karo*, 468 U.S. 705, 721, 104 S.Ct. 3296, 3306, 82 L.Ed.2d 530 (1984).

### III. Conclusion

The warrantless entry of 6915 Idlewild Road by the police in this case was justified by the existence of exigent circumstances. The standard in Fourth Amendment cases is one of reasonableness. On the facts

presented by this case, the officers acted reasonably at every turn of events, and the information and evidence they ultimately obtained was the product of lawful police action which does not offend constitutional principles.

### IV. Recommendation

Based upon the foregoing findings of fact and conclusions of law, I respectfully recommend that Defendant's Motion to Suppress be DENIED.

Counsel are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Failure to file objections to this Memorandum with the district court will preclude counsel from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

Respectfully submitted, this 19th day of August, 1988.