**UNITED STATES of America**

v.

**VELASQUEZ, Cecilia, Appellant in No. 79–2737,**

**Velasquez, Pauline, Appellant in No. 79–2777.**

**Nos. 79–2737 and 79–2777.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) on May 22, 1980.

Decided July 23, 1980.

As Amended Aug. 5, Sept. 23, Oct. 16, 1980.

Barry H. Denker, Mary McNeill Greenwell, Philadelphia, Pa., for appellant, Pauline Velasquez.

Dennis H. Eisman, Philadelphia, Pa., for appellant, Cecilia Velasquez.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Section, Curtis E. A. Karnow, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Cecilia and Pauline Velasquez appeal from the entry of conditional guilty pleas on charges of conspiracy, possession and distribution of methamphetamine in violation of 21 U.S.C. §§ 841, 846 (1976). They allege that the district court erred in refusing to grant a suppression motion based on their claims that a warrantless forced entry, arrest and search by officers of the Drug Enforcement Administration (DEA) violated, *inter alia*, their fourth amendment right to be free from unreasonable searches and seizures. The Government argues that compliance with the fourth amendment's requirement of arrest and search warrants was unnecessary because of the presence of exigent circumstances. Additionally, Pauline Velasquez claims her fifth amendment rights were violated by the use of an incriminating statement made by her after she was advised of her *Miranda* rights but before any clear indication was made by her of waiver of those rights.

We believe that no exigent circumstances existed to justify the warrantless arrest and search. However, we conclude that Pauline Velasquez did waive her fifth amendment rights. Accordingly, we reverse in part and affirm in part the judgment of the district court denying the motions to suppress.

### I.

The facts leading to the challenged entry, arrest and search are typical of the plethora of narcotics prosecutions which fill the pages of modern legal history. James McNesby, a DEA undercover agent, had purchased some methamphetamine drugs from appellant Pauline Velasquez on January 30, 1979. Officer McNesby arranged for a subsequent purchase of drugs which was to take place at Velasquez' home on February 6, 1979. McNesby assembled sur-

veillance teams and an additional six or eight federal agents to accompany him to the Velasquez residence. No arrest or search warrants were obtained. The plan called for McNesby to enter the Velasquez home and negotiate the sale. He would then return to his car to obtain the purchase money which was to be a signal to the surveillance team to proceed promptly thereafter to accomplish the arrest.

McNesby met Cecilia Velasquez, Pauline's daughter, outside the house and together they proceeded inside. There, Cecilia displayed a brown paper bag and requested $6,400 for the drugs. McNesby replied that he wanted to "check the meth out first" to which Cecilia replied that they did not conduct business that way. Cecilia called upstairs to Pauline that McNesby did not have the money. She proceeded to a second floor landing and gave the paper bag to Pauline. Cecilia returned downstairs and told McNesby to get the money. McNesby then returned to his car but radioed the surveillance team to "wait a minute" before closing in on the house because he had not actually seen the drugs. McNesby returned to the Velasquez residence.

Approximately thirty seconds after McNesby's reentry into the Velasquez household, a bang or a knock was heard at the door. There was a dispute as to whether the officers announced their identity but it was undisputed that they failed to announce their purpose. Roughly twenty to thirty seconds elapsed and after hearing no response, the officers forcibly entered the house. McNesby was on the third floor where he encountered Cecilia and Pauline Velasquez exiting a front bedroom empty-handed.

The officers on the first floor spread out and searched the entire house. McNesby met them on the second floor and told them he suspected the drugs were in the third floor front bedroom. Cecilia and Pauline Velasquez were placed under arrest in a second floor bedroom. The search proceeded to the third floor front bedroom where they encountered an old woman who suspiciously moved a chair in front of a closet and sat down. The officers searched the closet and found a brown paper bag containing methamphetamine.

Meanwhile, on the second floor, Cecilia and Pauline were read their *Miranda* rights from a standard form. Pauline indicated that she understood her rights. She, however, signed no waiver of her rights yet proceeded to make certain statements which the Government sought to introduce against her.

The Velasquezes moved to suppress the drug evidence seized by the DEA as the product of a search and seizure violative of the fourth amendment. Pauline Velasquez moved to suppress the statements made to the arresting officers, on the ground that they were obtained in violation of her fifth amendment right against self-incrimination. The district court denied the motion to suppress the drug evidence holding that exigent circumstances, namely fear of destruction of the evidence and fear for Officer McNesby's physical safety, warranted dispensing with a warrant. The court rejected Pauline's fifth amendment claim holding that "the warnings that were given to Pauline were the kinds of warnings that are required in order to make a statement voluntary under the law." Following denial of the suppression motion, the appellants entered conditional guilty pleas to all charges and were sentenced to two consecutive five-year prison terms to be followed by a three-year special parole term. This appeal followed.

II.

The fourth amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and [that] no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." We have disapproved of warrantless arrests in private dwellings as violative of the fourth amendment in the absence of exigent circumstances, *see United States v. Davis*, 461 F.2d 1026, 1030 (3d Cir. 1972), a view espoused by a majority of the federal courts of appeals and recently approved by the Supreme Court in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371,

63 L.Ed.2d 639 (1980). In *Payton*, the Court stated:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms . . . . In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Id.* at 589–590, 100 S.Ct. at 1381.

The realities and practicalities of law enforcement dictate that in certain emergency situations, strict compliance with statutory and constitutional safeguards against intrusion into the sanctity of the home may be excused. Such exigent circumstances have been recognized in a variety of contexts but two situations are commonly considered to be of sufficient exigency to justify the governmental intrusion: (1) where there is a risk of destruction of evidence or escape of the defendants, *see, e. g., United States v. Rubin*, 474 F.2d 262, 268 (3d Cir.), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); *Davis, supra; United States v. Singleton*, 439 F.2d 381, 385–86 (3d Cir. 1971); and (2) where there is a threat of physical harm to a police officer or other innocent individual, *see, e. g., Sabbath v. United States*, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1961); *United States v. Shye*, 492 F.2d 886, 892 (6th Cir. 1974); *Rubin, supra*, 474 F.2d at 268; *United States v. Pino*, 431 F.2d 1043, 1045 (2d Cir. 1970), *cert. denied*, 402 U.S. 989, 91 S.Ct. 1675, 29 L.Ed.2d 154 (1971). The Government contends and the district court agreed that these circumstances existed and justified the governmental intrusion into the privacy of the Velasquez' home in this case. The Velasquezes urge that there were no objective indicia that the contraband was about to be destroyed, that they were about to escape, or that Agent McNesby was in any danger. We are constrained to agree.

As to the possible destruction of the drugs, there is nothing in this record to suggest that the contraband was about to be destroyed. There is nothing to indicate that the Velasquezes suspected that McNesby was an undercover agent. McNesby apparently did not act as if they did. When he first met Pauline inside the house, he had not seen any drugs—only a brown paper bag which may or may not have contained them. On McNesby's return to his car, he radioed his fellow officers to wait before proceeding with the arrest so that he could verify the presence of the drugs and conclude the sale. These actions demonstrate one of two things. Either McNesby was dubious whether the bag contained drugs, or, if he thought drugs *were* in the bag, he must also have believed he could safely delay their seizure until he made the purchase without risking their destruction by the Velasquezes.

Nor do we find evidence that, when his fellow officers rushed to the door in disregard of McNesby's instructions, they did so because they heard sounds inside the house which would indicate that the drugs were being destroyed. McNesby did not call out to them that the drugs were being destroyed. In fact, the record reveals that the Velasquezes first became aware that a "bust" was occurring when the officers forcibly entered and arrested them. We conclude therefore that there could not have been a "reasonable belief that evidence [was about to] be destroyed." *Singleton, supra*, 439 F.2d at 385–86.

Similarly, there is no indication that the Velasquezes were about to escape. There is no evidence of flight from the house, and given McNesby's presence in the house, we do not perceive how the possibility of escape posed a real threat.

Finally, we must consider whether sufficient evidence of possible harm to officer McNesby could have justified the warrantless arrests. The DEA officers testified that when they knocked on the door and heard no response, they feared for McNesby's safety and accordingly proceeded to forcibly enter the Velasquez home. However, the crime for which the Velasquezes

were under suspicion was not a violent one and there was absolutely no indication that anyone inside the Velasquez home was armed. This is not a case where "there was . . . a substantial likelihood of bloodshed or an impending seige if quick action were not taken." *United States v. Shye, supra*, 492 F.2d at 892. We see absolutely no evidence that McNesby was in any physical danger and the mere lack of response to the officers at the door is an insufficient indication of possible harm to merit dispensing with a warrant. We conclude that there was insufficient indication of possible physical harm to Officer McNesby to justify the warrantless arrest.

 This entire episode appears to have been conceived as a warrantless "buy-bust," *i.e.*, a warrantless arrest for a crime that the officers anticipated would be committed in the presence of Officer McNesby. Perhaps such an arrest could have been carried out without infringing the Velasquezes' fourth amendment rights. If so, McNesby could have summoned the back-up officers to assist him in the "bust," having himself witnessed the commission of a crime. *See, e.g., United States v. Ryles*, 451 F.2d 190 (3d Cir. 1971), *cert. denied*, 406 U.S. 926, 92 S.Ct. 1796, 32 L.Ed.2d 127 (1972) (per curiam). However, the officers on this assignment went ahead and broke into the Velasquezes' house without waiting for McNesby's signal. The original mission was thus aborted, possibly due to a factor such as lack of training, inexperience, or a failure to plan the mission adequately. This failure had nothing to do with "exigent circumstances." We do not believe the Government should be permitted ex post facto to justify the miscarriage of its agents' plans on grounds of exigent circumstances when none in fact were present. Accordingly, we hold that the drugs seized should have been suppressed as evidence obtained in a warrantless arrest in violation of the fourth amendment.

 Alternatively, even if the arrests were constitutional, we believe the evidence should have been suppressed as the product

of an unreasonable warrantless search of the Velasquez household. Upon entering the house the government agents placed the Velasquezes under arrest in a second floor bedroom, spread out, and conducted a general search of the house. The drugs were ultimately found in a brown paper bag concealed in a third floor bedroom closet.

General warrantless searches of private dwellings have long been condemned as violative of the fourth amendment except in certain narrow circumstances. In *Chimel v. California*, 395 U.S. 752, 768, 89 S.Ct. 2034, 2042, 23 L.Ed.2d 685 (1969), the Court held that the scope of a search incident to an arrest could not proceed "beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him." Searching for weapons or evidence close to the defendant's person is necessary to protect the arresting officers from physical harm and to prevent destruction of evidence. However,

> [t]here is no comparable justification . . . for routinely searching any room other than that in which the arrest occurs—or for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.

*Id.* at 763, 89 S.Ct. at 2040 (footnote omitted). The search in the instant case went far beyond the room in which the appellants were arrested and thus was unconstitutional unless it falls within an exception mentioned by *Chimel*. Warrantless searches, like warrantless arrests, may be excused if exigent circumstances are present. *See United States v. Rubin, supra*, 474 F.2d at 268–69. Our conclusion that no exigent circumstances existed to justify the warrantless arrests applies equally to the scope of the search. We do not believe that the threat of destruction of evidence, escape, or physical harm to the police officers, justified the extensive search conducted here.[1]

---

1. The Government's argument appears to be that a protective sweep was necessary to insure that no one in the house was armed. It emphasizes the possibility that a person could

We therefore conclude that the search was overbroad and that the evidence seized should have been suppressed as the product of an unconstitutional search.[2]

### III.

We must nonetheless consider whether the introduction into evidence of incriminating statements by Pauline Velasquez violated her fifth amendment rights. There was some dispute between the parties as to whether the government agents advised Pauline of her *Miranda* rights. The district court found, however, that the warnings were given and we do not believe this finding was clearly erroneous. Nevertheless, Pauline did not sign any formal waiver of rights. In response to questioning by a Sgt. Baron concerning why she ran to the third floor following the entry of the agents, Pauline allegedly stated that she "ran to drop the bag, to hide the bag, . . . that she was concerned about her daughter and that she really didn't have any involvement with this whatsoever." Pauline denies that she made such a statement, arguing that there were no witnesses to her conversation with Sgt. Baron and no written notes were taken of it. She also argues that the mere fact that she made statements following the giving of the *Miranda* warnings did not constitute a sufficient waiver of her fifth amendment rights to permit the use of the statements against her. We agree with the district court that there was sufficient indication that Pauline waived her fifth amendment rights.

For many years following the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), there was considerable confusion over whether an express waiver of the defendant's *Miranda* rights was prerequisite to the use of the incriminating statement at trial. It was clear that under *Miranda*, the mere silence of the defendant following the issuance of the required warnings was insufficient to constitute a waiver. *See* 384 U.S. at 475, 86 S.Ct. at 1628. What was unclear was whether a waiver could be inferred from subsequent conduct on the part of the defendant. The Supreme Court in *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), resolved this question holding: "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." In *Butler*, the defendant had been orally given the *Miranda* warnings at the scene of his arrest and a written Advice of Rights form was given to him at the station house after it was determined that he was literate. The defendant refused to sign the waiver of rights form but nonetheless agreed to answer questions and never attempted to request counsel or terminate the questioning. *See* 441 U.S. at 370–71, 99 S.Ct. at 1756. The North Carolina Supreme Court had held that *Miranda* absolutely required an explicit waiver before statements could be admitted. The Supreme Court reversed, re-

---

have fit inside the third floor closet in which the drugs were found. In the absence of any evidence that anyone was indeed armed and in light of the officer's suspicions that the drugs were indeed hidden there, we see no justification for searching the closet on the ground of protecting the officers' physical safety.

The evidence was not in "plain view" which might also have justified a warrantless search and seizure. *See Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971).

**2.** Appellants raised orally at the suppression hearing a violation of 18 U.S.C. § 3109 (1976) as a ground for suppression. The statute provides:

The officer may break open any outer or inner door or window of a house, or any part

of a house, or anything therein, to execute a search warrant, if after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

The Government concedes non-compliance with the requirement that the officer announce his purpose. However, the Government argues and we agree that strict compliance with section 3109 was excusable because to announce purpose would have been a "useless gesture." *See Miller v. United States*, 357 U.S. 301, 310, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

jecting this per se rule, but without explicitly defining what might constitute an implied waiver. Thus, *Butler*, although it stands for the proposition that a waiver can be implied, does not explicitly set forth what conduct might suffice for such an implied waiver. Accordingly, we must determine the question of waiver on "the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), *quoted in Butler, supra*, 441 U.S. at 374–75, 99 S.Ct. at 1758.

We believe the Government has met its burden in overcoming the presumption against waiver under the facts of this case. Although Pauline denied that the *Miranda* warnings were given, the district court found otherwise. Further, Sgt. Baron testified:

> Q. O.K. When you were reading her her rights, did she give you responses?
>
> A. Yes.
>
> Q. And what were her responses?
>
> A. That she understood what I was telling her.
>
> Q. And what else?
>
> A. That's all as far as the rights were concerned.

We hold that on this record Pauline's subsequent willingness to answer questions after acknowledging that she understood her *Miranda* rights is sufficient to constitute an implied waiver under *Butler. Accord, United States v. Stark*, 609 F.2d 271, 272–73 (6th Cir. 1979) (per curiam). *See United States v. Hines*, 605 F.2d 132, 133–34 (4th Cir. 1979). Accordingly, the district court did not err in not suppressing the statements Pauline made to the arresting officer.

### IV.

The judgment of the district court insofar as it denies suppression of the drug evidence seized will be reversed. The judgment of the district court insofar as it denies suppression of Pauline Velasquez' statements will be affirmed. The appellants' guilty pleas will be vacated and the cases remanded for further proceedings not inconsistent with this opinion.