**UNITED STATES of America**

v.

**CHUN Yen Chiu, Gi Hun Jen, An Di Li, Chun Ming Li, Ming Shan Lu, Ai Ming Yang, and Chao Young.**

**Crim. No. 93–289 (MLP).**

United States District Court, D. New Jersey.

Nov. 23, 1993.

Aidan O'Connor, Asst. U.S. Atty., Newark, NJ, for U.S.

Michael Sullivan, Asst. Federal Public Defender, Trenton, NJ, for defendant Gi Hun Jen.

James F. Fine, Newark, NJ, for defendant Chun Ming Li.

Michael V. Gilberti, Budd Larner Gross Rosenbaum Greenberg & Sade, Short Hills, NJ, for defendant An Di Li.

Michael N. Pedicini, Morristown, NJ, for defendant Ming Shan Lu.

## MEMORANDUM AND ORDER

PARELL, District Judge.

This matter comes before the court on motion by criminal defendants, Gi Hun Jen, An Di Li, Chun Ming Li and Ming Shan Lu, to suppress evidence on the basis that it was obtained as the result of an illegal search and seizure. For the following reasons, the motion to suppress is granted.

### FACTS

The facts, as determined by the court, have been ascertained from (a) the affidavit of Kevin R. Ryan, Special Agent of the United States Immigration & Naturalization Service, dated May 28, 1993, which was submitted in support of the criminal complaints filed against the defendants;[1] (b) two Jersey City Police Department reports filed by James Witanek on May 21, 1993 and May 24, 1993;[2] and (c) the testimony of Sergeant James McGuire of the Jersey City Police Department and of Special Agent Brian Mallon of the United States Immigration & Naturalization Service which was given at the hearing on this matter held on November 1, 1993.

Sometime in May, 1993, representatives of New Jersey Bell Telephone noticed that an unusually large number of calls were being made to China from telephone numbers recently connected at 239 Barrow Street in Jersey City. The phone company records indicated that a Chinese restaurant was located at 239 Barrow Street. James Witanek, the assistant manager of security at New Jersey Bell Telephone, went to 239 Barrow Street and discovered that it was a warehouse or garage with all visible entrances completely padlocked from the outside.

Mr. Witanek returned several times to investigate the matter and on each occasion found that the premises continued to be padlocked from the outside. Fearing that perhaps a fraud was being perpetrated on the telephone company, Mr. Witanek went to the Jersey City Police Department on May 21, 1993 and registered a complaint. On the morning of May 24, 1993, Mr. Witanek returned to the Jersey City Police Department and discussed the matter with Sergeant James McGuire. At some point during their discussion Mr. Witanek left for a few minutes to call the telephone company. When he returned he informed Sgt. McGuire that the phone lines located at 239 Barrow Street were currently in use and requested that the police accompany him to 239 Barrow Street.

---

1. Statements of fact which are contained in a sworn assurance made by an authorized government agent to a judicial officer are considered to represent the government's position, not merely the views of the agent. *United States v. Morgan,* 581 F.2d 933, 937 n. 10 (D.C.Cir.1978).

2. These two reports were admitted into evidence at the hearing on November 1, 1993 as Defendants' Exhibit 2. Sgt. McGuire reviewed the information contained in the reports his testimony at the hearing.

At approximately 10:00 a.m., Sgt. McGuire and Detective Dennis O'Connell went with Mr. Witanek to 239 Barrow Street to investigate the matter. The officers found that all the doors and entrances to the building were padlocked from the outside with no visible means of exit. There were rolldown metal gates on the entrances. The officers walked completely around the perimeter of the premises looking for any indication of telephone fraud, e.g., pirate telephone lines extending to neighboring buildings. No pirate lines were discovered. At that point Mr. Witanek again contacted the telephone company and discovered that the phone lines at 239 Barrow Street were still currently in use. Sgt. McGuire then proceeded across the street and stood on an apartment house stoop in order to look over top of the garage section of the building located at 239 Barrow Street. He observed a second story located above the back half of the garage and further observed two opened, adjoining windows on the second story. He could not see into the windows from his vantage point, but he could tell that a window was open because he saw a curtain fluttering out of the building.

At approximately 10:45 a.m., Sgt. McGuire proceeded to call the Emergency Service Unit ("ESU") of the Jersey City Police Department. When the officers from ESU arrived they placed a ladder up against the garage at 239 Barrow Street, climbed up on top of the roof of the garage and peered into the two opened windows on the second story. The officers observed that there were metal bars on the windows and that a large number of Oriental males were inside on the second floor. The officers tried to communicate with the individuals inside, both in English and Vietnamese, but got no response. Sgt. McGuire testified that upon learning that a large number of individuals were inside the building, and given the fact that there was no apparent way for these individuals to readily exit the building, he felt that there was a public safety emergency because the individuals were confined within the building.

Sgt. McGuire then contacted the Del Forno Realty Company, the realty agent for 239 Barrow Street, and requested that someone from the company deliver to the premises the keys for the padlocks, if they had them. At approximately 11:15 a.m., Mr. Vito Del Forno and Mr. Lawrence Perlaki, who are both employed by the realty company, came to 239 Barrow Street and unlocked the padlocks in order to allow the police to enter.

The officers entered and found inside approximately sixty-one individuals of Chinese descent. Prior to entering the premises at 239 Barrow Street, no attempt was made by the police to determine the identity of the tenant renting the premises or to contact the tenant. Once inside, at approximately noontime, the officers contacted the United States Immigration & Naturalization Service ("INS").

Special Agent Brian Mallon of the INS, accompanied by two other INS agents, subsequently arrived at 239 Barrow Street between approximately 1:00 and 2:00 p.m. Neither the police officers nor the INS agents were able to communicate with any of the sixty-one individuals at 239 Barrow Street. Agent Mallon contacted a translator and had her speak over the phone with a few of the sixty-one individuals who were willing to cooperate in order to figure out what was going on. A couple of hours later another INS agent arrived at 239 Barrow Street and he was able to communicate with a few of the sixty-one individuals. It was determined that the sixty-one individuals were illegal aliens from China. Based upon interviews with some of the individuals, the government received information to the effect that approximately fifty-seven of these individuals were being held inside 239 Barrow Street against their will until payment was made for their release and that at least four of the remaining individuals were responsible for maintaining order and preventing escape.

At least one of the phones at 239 Barrow Street was located on a table on the first floor. When Agent Mallon used this phone he observed various types of documents[3]

---

3. The documents found at 239 Barrow Street include newspapers, sheets of paper and note-books, all containing handwritten notations.

lying on, around and underneath the table which he recognized, based on his experience in handling similar investigations, to be alien smuggling records. According to Agent Mallon, there were many documents strewn all about on the first floor. Some of these documents were under personal effects, such as clothing and mattresses lying directly on the floor. Agent Mallon noticed some crumpled up papers stuffed into a hole made in a wall down near the baseboard. As he began to pull the papers out of this hole he reached his arm through the hole and, in so doing, discovered two handguns wrapped in a towel which had also been stuffed inside the hole. None of the documents were marked for identification as they were discovered. During the course of the investigation at 239 Barrow Street, one of the INS agents on the premises heard a beeper go off and, by following the sound, discovered a beeper stuffed inside a hundred pound bag of rice lying against a wall on the first floor. Two other beepers were also discovered at 239 Barrow Street.

During the time that the police officers and the INS agents were performing their investigation at 239 Barrow Street, the sixty-one individuals were secured on the second floor. Individuals were permitted onto the first floor for limited purposes, such as talking on the phone to the translator. Agent Mallon testified that he was at 239 Barrow Street for approximately two hours before he began picking up documents and examining them, that he was there approximately three or four hours before the beepers were discovered, and that he was there for six hours before he discovered the guns. All of this evidence was discovered on the first floor.

On June 2, 1993, a two count indictment was filed against the seven named defendants in this criminal action.[4] Count One charges the defendants with conspiring between March 30, 1993 and May 27, 1993 to harbor illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(C) and 18 U.S.C. § 371. Count Two charges the defendants with harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(C) and with aiding and abetting the harboring of illegal aliens in violation of 18 U.S.C. § 2. On October 27, 1993, the government filed a superseding indictment which added two additional counts. One of the additional counts charges defendants with hostage taking in violation of 18 U.S.C. § 1203 and § 2. The other additional count charges defendants with use of a firearm in connection with hostage taking (a crime of violence) in violation of 18 U.S.C. § 924(c) and § 2.

## DISCUSSION

Defendants Gi Hun Jen, An Di Li, Chun Ming Li and Ming Shan Lu were the four individuals locked inside 239 Barrow Street who were allegedly responsible for maintaining order and preventing anyone from escaping. These four defendants have moved to suppress all the evidence obtained from 239 Barrow Street on the basis that it was obtained as the result of an illegal search and seizure. The government argues that these four defendants do not have standing to move to suppress the evidence found at 239 Barrow Street because they did not have a legitimate expectation of privacy in the premises. Further, the government contends that, even if the defendants do have standing, the warrantless search was not illegal because the officers had the consent of the agents from the realty company to enter and, in addition, there were exigent circumstances which justified a warrantless entry. The government argues that since the officers and INS agents were thus lawfully on the premises, and since all the evidence seized was in plain view, there was no violation of the defendants' Fourth Amendment rights and this evidence should not be suppressed.

4. There are three other named defendants who did not make a motion or join in the motion to suppress the evidence seized at 239 Barrow Street. Defendant Chao Young is the individual who rented the premises at 239 Barrow Street and, as of this date, he remains a fugitive from justice. Defendant Ai Ming Yang subscribed for, and paid the deposit for, the telephone service at 239 Barrow Street. Upon information and belief, defendant Ai Ming Yang is the wife of defendant Chao Young. Based upon additional information not relevant to this motion, defendant Chun Yen Chiu is another alleged participant in the charged crimes. Defendant Chiu was listed on the rental application for 239 Barrow Street. None of these three defendants were present at 239 Barrow Street when the search took place.

## I. *Standing*

■ Whenever a defendant moves to suppress evidence on the basis that it was seized as the result of an illegal search, the defendant has the burden of demonstrating that he has standing to challenge the legality of the search. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978); *United States v. Acosta,* 965 F.2d 1248, 1256 n. 9 (3d Cir.1992). In order to prove standing a defendant must demonstrate that he had a legitimate expectation of privacy in the place searched or the items seized by showing an actual, subjective expectation of privacy which society is prepared to recognize. *Minnesota v. Olson,* 495 U.S. 91, 95, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990); *United States v. Salvucci,* 448 U.S. 83, 93, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *United States v. Dickens,* 695 F.2d 765, 777–78 (3d Cir.1982), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983).

■ The government here contends that the four defendants inside 239 Barrow Street did not have a legitimate expectation of privacy in the premises. As support for this contention the government points to the fact that, although these defendants are alleged to have been responsible for maintaining discipline and for keeping anyone from escaping, the defendants had no control over who could enter the premises because all the entrances were padlocked from the outside, and further the defendants have not demonstrated that they had permission from the tenant to be inside the warehouse.

The government's arguments that these defendants did not have a legitimate expectation of privacy in the warehouse located at 239 Barrow Street are unpersuasive in light of the facts of this case. According to the government's own allegations, these defendants controlled and supervised all activity that went on inside the locked warehouse. Although it is true that these defendants had no known way of letting themselves out of the warehouse or of letting anyone else in,

they did have a legitimate subjective belief that the padlocks on the outside would prevent persons, other than persons which it can be reasonably inferred were known to them, from entering. *United States v. Pollock,* 726 F.2d 1456, 1465 (9th Cir.1984) (defendant had an actual, subjective expectation of privacy where facts demonstrated he had "joint control and supervision of the place searched ... where [the evidence was] concealed").

Further, defendant Chao Young, who remains a fugitive, is the individual who rented 239 Barrow Street and who allegedly conspired with these four defendants to commit the charged crimes. Therefore, if defendant Chao Young, the tenant for the premises and the individual whose grant of permission is at issue, conspired with these four defendants to engage in illegal activity inside 239 Barrow Street as alleged by the government, it can reasonably be inferred that Young gave these four defendants permission to be inside the warehouse. *United States v. Williams,* 3 F.3d 69, 73 (3d Cir.1993) (court can make reasonable inferences of fact).

Still further, by the government's own admissions, these defendants were living on the first floor of 239 Barrow Street. (Testimony of Agent Mallon, Tr. of hearing held November 1, 1993 at 126, 160–61; Aff. of Agent Ryan ¶ 6). It is a well-settled principle of constitutional law that an individual has a legitimate expectation of privacy in his home or residence. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925). The defendants here slept and ate within the confines of the premises and spent most, if not all, of their time there. Although a warehouse or garage is not normally considered to be a private home or residence, under the circumstances of this case, it is apparent, for all intents and purposes, that these defendants were living within this warehouse and had a subjective expectation of privacy in the premises, as well as in items contained within the premises. *Minnesota v. Olson,* 495 U.S. 91, 96–97, 110 S.Ct. 1684, 1687–88, 109 L.Ed.2d 85 (1990) ("a place [does not have to] be one's 'home' for one to have a legitimate expectation of privacy there," and fact that

defendant had slept a night at friend's apartment was sufficient to confer standing to challenge the search).

The government relies on *Babula v. INS,* 665 F.2d 293 (3d Cir.1981), as support for the assertion that defendants do not have standing to challenge the search of the warehouse. However, the facts of the *Babula* case are distinguishable from the facts of this case. In *Babula,* the defendants were illegal aliens working at a factory who were arrested as the result of an INS investigation at the factory. The Court of Appeals for the Third Circuit held that these factory workers did not have a legitimate expectation of privacy in the factory premises and that they therefore did not have standing to assert the Fourth Amendment right of the factory owner. *Id.* at 297. The major distinction between the facts in *Babula* and the facts in this case is that in *Babula* the place invaded by the INS agents was a public workplace whereas the place invaded in the instant case was a warehouse which was not open to the public and which was padlocked so as to bar members of the public from entering. The defendants in the instant case had no reason to believe that the public could gain entry to the warehouse. In *Babula,* the public nature of the factory workplace supports the finding of the court that the factory workers had no legitimate expectation of privacy there.

Therefore, this Court concludes that the defendants have standing to challenge the legality of the search and seizure at issue here.

## II. *Legality of the Search and Seizure*

The defendants argue that the government's warrantless search of 239 Barrow Street was per se illegal and that the circumstances known to the officers at the time of the search did not provide an exception to the warrant requirement. The government alleges that, in the first instance, exigent circumstances existed which justified a warrantless search, and in the alternative, the search was legal because the officers had the consent of the agents of the realty company to enter onto the premises.

The evidence demonstrates that the search of the premises at 239 Barrow Street did not first commence when the officers gained entry through the doorway, but rather the search began when the officers climbed onto the roof of the warehouse in order to peer inside through the second story windows. On this point, the government alleges that the defendants had no legitimate expectation of privacy in the view through the windows on the second story obtained by standing on top of the warehouse roof. However, the facts indicate that the defendants did have a legitimate expectation of privacy as to this view.

■ As a general rule, it is not unlawful for officers outside the curtilage to observe what occurs thereon. *Ramsey v. United States,* 278 F.2d 368, 369 (6th Cir.1960). However, "standing on a man's premises and peering in his window constitute[s] a search" because it is a violation of the right of privacy. *State of Texas v. Gonzales,* 388 F.2d 145, 147 (5th Cir.1968). It is clear that, as to the area surrounding a residence or home, there exists a heightened expectation of privacy. *Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980); *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984); *United States v. Velasquez,* 626 F.2d 314, 316–317 (3d Cir.1980). However, "the owner or occupant of a commercial building may also manifest a reasonable expectation of privacy," even though that expectation may not enjoy the heightened expectation surrounding a private home. *Tarantino v. Baker,* 825 F.2d 772, 778 (4th Cir.1987). The occupant of a commercial building has a reasonable expectation of privacy in those areas from which the public has been excluded. *Id.*

■ Sgt. McGuire testified that from his vantage point on the stoop across the street from the warehouse he could not see inside the second story windows. In order to see inside the window, the police needed to stand on the roof of the premises at 239 Barrow Street. Moreover, the fact that the police required a ladder to climb on top of the roof of the warehouse demonstrates that the public did not have physical access to this area. The occupants of the warehouse could reasonably have expected that persons would

not use a ladder to climb onto the roof of the warehouse in order to peer into the second story windows.

Therefore, whether the premises at 239 Barrow Street are viewed as commercial property or as a makeshift residence, clearly those inside had a reasonable expectation of privacy as to the view through the windows accessible only from the second story roof. Thus, when the officers climbed onto the roof for the purpose of peering into the second story window, they were conducting a search.

 Searches conducted without a warrant are per se illegal, even where the police have probable cause to suspect criminal activity, unless the circumstances fall within one of a few narrowly delineated exceptions to the warrant requirement. *Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925); *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Katz v. United States,* 389 U.S. 347, 356–57, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The government has the burden of establishing that the circumstances fall within one of these exceptions. *United States v. Herrold,* 962 F.2d 1131, 1137 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992). If the government cannot make the requisite showing of exceptional circumstances, then the exclusionary rule requires that evidence illegally seized must be suppressed. *Id.* (citing *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)).

One exception to the warrant requirement exists where the police are confronted with exigent circumstances. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Another exception is had where the police obtain a valid consent to enter without a warrant. *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

The government has not alleged that there were exigent circumstances which justified the officers' warrantless entry onto the roof. Nor has the government alleged that the officers obtained any form of consent to go onto the roof. Indeed, Sgt. McGuire testified that at the point he directed the officers from ESU to climb onto the roof, he did not suspect any criminal activity, but rather he

was just looking around. Thus, the search was illegal and any evidence subsequently derived therefrom should be suppressed.

But even if it could be assumed that the officers' entry onto the roof of the warehouse did not constitute a search, it is undisputed that their subsequent entry through the doorway did constitute a search. As to this search the government argues that exigent circumstances existed because the doors on the building were padlocked from the outside and the windows all had metal bars, thus rendering the occupants inside trapped with no visible means of exit should a fire or other catastrophe occur. The government argues that, faced with this situation, the police officers had a right and a duty to gain entry to further investigate the situation and to determine whether anyone inside was in need of help or medical assistance. However, the undisputed facts do not support the government's claim of exigent circumstances in this case.

 Whether or not exigent circumstances exist to justify a warrantless search is a determination which depends on the facts that were known by the police at the time the search was conducted. *United States v. Velasquez,* 626 F.2d 314, 316–317 (3d Cir.1980). The Third Circuit has held that "emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized." *United States v. Rubin* 474 F.2d 262, 268 (3d Cir.), *cert. denied,* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973). "Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that [evidence] is about to be removed; (3) the possibility of danger to police officers guarding the site ... while a search warrant is sought; (4) information indicating that [persons inside] are aware that the police are on their trail; and (5) the ready destructibility [or removability] of evidence." *Id.*

 Sgt. McGuire testified that, even upon learning that there were a large number of Asian individuals locked inside the warehouse, he did not at that point suspect

that a crime had been or was being committed. Rather, he testified that his reason for gaining entry to the warehouse was based on his concern for the safety of the individuals locked inside should a fire or other catastrophe occur. The government asserts that it was this concern which amounted to exigent circumstances.

Case law dealing with exigent circumstances makes it clear that where there is an actual fire, *Steigler v. Anderson,* 496 F.2d 793 (3d Cir.), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974), or where there is an imminent threat of a fire, *U.S. v. Moskow,* 443 F.Supp. 571 (E.D.Pa.1977), *aff'd* 588 F.2d 882 (3d Cir.1978) (strong odor of gasoline), then exigent circumstances exist such that no warrant is required to enter. However, under the circumstances of this case, the police had no indication that there was an actual fire or that there was any imminent threat of a fire. Further, alternative means existed to adequately ensure the safety of these individuals in the unlikely event of a fire. Simply cutting the padlocks off the entrances without entering the building would have addressed the safety concern. A fire truck could have been called to stand by. All this could have taken place while the police secured a warrant to enter the building.

The amount of time necessary to obtain a warrant was not shown to be great, and assuming that a magistrate would have determined that probable cause existed, a warrant presumably could have been obtained in a relatively short amount of time. Sgt. McGuire testified he was aware of the process whereby warrants can be obtained over the telephone in a relatively short time period. Further, there was no urgency here of a degree which obviated the need to obtain a warrant. According to Sgt. McGuire, at the point that the police entered the warehouse, it was not on the basis of suspected criminal activity. Thus, the officers did not have reason to believe that evidence was about to be removed or destroyed. Further, there was nothing which indicated there would have been a danger to police officers left to guard the site while a search warrant was sought.

Thus, the totality of the circumstances known to the police at the time they gained entry inside the warehouse did not amount to exigent circumstances.

In *United States v. Pacheco–Ruiz,* 549 F.2d 1204 (9th Cir.1976), the Court of Appeals for the Ninth Circuit held that, even though the officers had probable cause to believe that illegal aliens were being concealed in or about the house, because a magistrate who could issue a warrant was presumably within a reasonable distance, and because there were a sufficient number of officers present at the site to make sure no one could leave without being checked for citizenship, exigent circumstances did not exist. *Id.* at 1207; *see also United States v. Rodriguez,* 532 F.2d 834, 839 (2d Cir.1976) (where officers had probable cause to arrest suspected illegal alien and were lawfully inside the house to arrest the suspect, a suspicion that there were other illegal aliens inside the house did not amount to exigent circumstances to justify the ensuing search of the house).

The government argues in the alternative that the search was valid because the agents from the realty company gave the officers consent to enter through the doorway and, in fact, unlocked the padlocks to allow the entry. However, the facts of this case demonstrate that this argument is without merit.

In order to have a valid consent to search, the consent must be given by an individual with an independent right to consent to the search. *United States v. Mazurkiewicz,* 431 F.2d 839, 842 (3d Cir.1970). It is the government's burden to establish that a third party had the authority to consent to a search. *Illinois v. Rodriguez,* 497 U.S. 177, 179, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). Where police officers are faced with an ambiguous situation, unless further inquiry is made which determines that the property about to be searched is subject to "mutual use" by the person giving consent, it is unlawful to enter without a warrant. *United States v. Whitfield,* 939 F.2d 1071, 1075 (D.C.Cir.1991).

The Supreme Court, in *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), expressly held that a

landlord does not have the right to consent to the search of a tenant's premises. In *Chapman*, the landlord went to the rented house to invite a new tenant to attend church and noticed a strong odor of whiskey mash coming from inside the house. He contacted the police and when they arrived the landlord told them to go in through an unlocked window. The police went in and found a distillery and 1,300 gallons of whiskey mash. The Supreme Court held that the evidence found during this search was obtained unlawfully and should have been suppressed because "to uphold such an entry without a warrant would reduce the Fourth Amendment to a nullity and leave tenants' homes secure only in the discretion of landlords." *Id.* at 616–17, 81 S.Ct. at 780.

The Supreme Court, in *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), held that a hotel clerk does not have the right to consent to the search of a guest's room. The court noted that certain hotel personnel have the implied right to enter a guest's room to perform hotel duties, e.g., maid service, janitorial service, etc., but that there is no right to enter where the sole purpose for entering the room is to conduct a search. *Id.* at 489, 84 S.Ct. at 893. By way of analogy, even though a landlord may have the right to enter a tenant's premises to perform certain tasks, e.g., repair fixtures, etc., this does not give the landlord the right to enter the premises for the purposes of conducting a search. *Id.* at 489–90, 84 S.Ct. at 893; *United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir.1992). The *Stoner* court further stated that "[o]ur decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of apparent authority." *Id.* 376 U.S. at 488, 84 S.Ct. at 892.

The only indication in this case that the agents from the realty company may have had an independent right to enter the premises is the fact that they had the keys to the padlocks. Even assuming that agents from the realty company did have the right to enter because they had these keys, the question remains for what purposes did the agents have the right to enter. Nothing in the record before this Court indicates that these agents had the right to enter 239 Barrow Street for the purpose of conducting a search or for the purpose of permitting the police to conduct a search.

Thus, the consent to enter given by the agents from the realty company was not a valid consent and does not justify the warrantless search.

This court recognizes the likelihood that the police officers here were motivated by humanitarian concerns. Nevertheless, given the absence of exigent circumstances or a valid consent, these concerns do not obviate the constitutional requirement that a warrant be issued by a neutral and detached magistrate based on a finding of probable cause prior to the search of private property.

Since neither the search which took place when the officers climbed on top of the roof and peered in the second story windows nor the search which took place when the officers gained entry through the door were legal, any and all evidence which was seized during these searches, whether it was in plain view or not, should be suppressed. *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990) ("It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."); *United States v. Benish*, 5 F.3d 20, 24 (3d Cir.1993); *United States v. Pacheco–Ruiz*, 549 F.2d at 1207–08.

**IT IS**, therefore, on this 23rd day of November, 1993, hereby **ORDERED** that the motion by defendants Gi Hun Jen, An Di Li, Chun Ming Li and Ming Shan Lu, to suppress the evidence seized from 239 Barrow Street on May 24, 1993 on the basis that it was obtained as the result of an illegal search and seizure is **GRANTED.**